RECORD NUMBER: 13-2548

# United States Court of Appeals

*for the*

# Fourth Circuit

**LORD & TAYLOR, LLC,**

*Appellant,*

– v. –

**WHITE FLINT, L.P., f/k/a White Flint Mall, LLP,**

*Appellee.*

**ON APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MARYLAND AT GREENBELT**

# OPENING BRIEF OF APPELLANT

MICHELLE DEFINIS GAMBINO
KEVIN B. BEDELL
DAVID G. BARGER
GREENBERG TRAURIG, LLP
1750 Tysons Boulevard
Suite 1200
McLean, VA 22102
(703) 749-1300

*Counsel for Appellant
Lord & Taylor, LLC*



COUNSEL PRESS • VA – (800) 275-0668

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Only one form need be completed for a party even if the party is represented by more than one attorney.  Disclosures must be filed on behalf of <u>all</u> parties to a civil or bankruptcy case, corporate defendants in a criminal case, and corporate amici curiae. Counsel has a continuing duty to update this information.

No.  13-2548          Caption:  Lord & Taylor, LLC v. White Flint LP n/k/a White Flint Mall LLLP

Pursuant to FRAP 26.1 and Local Rule 26.1,

Lord & Taylor, LLC and LT Propco, LLC          who is  appellants

(name of party/amicus)          (appellant/appellee/amicus)

makes the following disclosure:

1.  Is party/amicus a publicly held corporation or other publicly held entity?
   ☐ YES          ☒ NO

2.  Does party/amicus have any parent corporations?
   ☒ YES          ☐ NO

   If yes, identify all parent corporations, including grandparent and great-grandparent corporations:  Lord & Taylor LLC is directly wholly owned by Lord & Taylor Holdings LLC (Delaware).  LT Propco, LLC, is directly wholly owned by LT Parent Propco LLC, which is directly wholly owned by Lord & Taylor Holdings LLC (Del.) which is directly wholly owned by Lord & Taylor Acquisition, Inc. (Delaware) which is directly wholly owned by Hudson's Bay Company (Canada).

3.  Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?
   ☐ YES          ☒ NO

   If yes, identify all such owners: However note that Lord & Taylor is indirectly wholly owned by Hudson's Bay Company which is publicly traded in Canada.

4.  Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?
   ☐ YES          ☒ NO

   If yes, identify entity and nature of interest:

5.  Is party a trade association? (amici curiae do not complete this question)
   ☐ YES          ☒ NO

   If yes, identify all members of the association, their parent corporations, and any publicly held companies that own 10% or more of a member's stock:

6.  Does this case arise out of a bankruptcy proceeding?
   ☐ YES          ☒ NO

   If yes, identify any trustee and the members of any creditors' committee:

s/Michelle D. Gambino          January 13, 2014

# TABLE OF CONTENTS

**Page**

DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS ...................................................................................i

TABLE OF AUTHORITIES ...................................................................vi

JURISDICTION.......................................................................................1

STATEMENT OF THE ISSUES PRESENTED....................................2

STATEMENT OF THE CASE.................................................................2

    A.    White Flint Is Bound By Restrictive Covenants That Prohibit It From Destroying The Enclosed Mall, The Common Areas And Lord & Taylor's Parking Lots. ................4

    B.    White Flint Decides that It Could Make More Money By Violating the Covenants and Constructing a New Type of Development. ...............................................................................9

    C.    White Flint Files a Motion for Partial Summary Judgment Seeking to Dismiss Lord & Taylor's Request for Specific Performance and Injunctive Relief. ......................12

SUMMARY OF ARGUMENT ............................................................13

STANDARD OF REVIEW .................................................................16

ARGUMENT .......................................................................................17

I.    THE DISTRICT COURT ERRED WHEN IT APPLIED THE FEDERAL PROCEDURAL STANDARD FOR OBTAINING A PERMANENT INJUNCTION FOR THE BREACH OF A RESTRICTIVE COVENANT. .........................................................17

    A.    The Trial Court Erred by Using the Federal Procedural Standard for Permanent Injunctive Relief Instead of the State Substantive Law Standard as Required Under *Erie*. .......18

B.     Irreparable Harm Need Not Be Shown Under Maryland Law for a Permanent Injunction to Issue. .................................22

C.     The District Court Committed Reversible Error By Utilizing the Federal Permanent Injunction Standard and Considering the Alleged "Public Interest" In Seeing the Covenants Breached..................................................................24

D.     Applying the Correct, Maryland Substantive Law, Standard Results in the Issuance of an Injunction, or at a Minimum Denial of White Flint's Motion. .............................26

E.     Granting White Flint's Motion Created a Split in the Law Concerning What Must Be Shown in Order to Permanently Enjoin the Breach of a Restrictive Covenant. ................................................................................28

F.     White Flint's Motion Should Have Been Denied Even Using the Federal Injunction Standard. ....................................30

II.     THE DISTRICT COURT ERRED AND MISAPPLIED MARYLAND LAW BY CONSIDERING THE COMPARATIVE HARDSHIP TO WHITE FLINT ..........................37

III.     THE DISTRICT COURT ERRED BY FINDING THE COVENANTS SHOULD BE DISREGARDED BECAUSE THE AREA AROUND THE SHOPPING CENTER SITE HAD "CHANGED." .....................................................................................39

A.     White Flint Did Not Move for Summary Judgment on This Affirmative Defense. .......................................................40

B.     White Flint Did Not Meet Its Burden of Proof to Establish a Radical Change in Circumstances Has Occurred, and at the Very Least, Fact Issues Exist Which Should Have Precluded Summary Judgment. ..........................41

IV.     THE DISTRICT COURT ERRED BY FINDING AN INJUNCTION WAS NOT JUDICIALLY FEASIBLE.....................46

iii

      A.    Lord & Taylor Did Not Ask The Court to Order White Flint to Rebuild Bloomingdale's or to Relet the Mall. .............47

      B.    Granting the Relief Sought By Lord & Taylor Requires No Judicial Oversight. .............................................................51

V.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY PREMATURELY GRANTING WHITE FLINT'S MOTION WITHOUT ALLOWING LORD & TAYLOR TO CONDUCT DISCOVERY.................................................................52

CONCLUSION ...................................................................................54

STATEMENT IN SUPPORT OF ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**Page**

<u>**Cases**</u>

*Adams v. Trustees of the Univ. of N. Carolina-Wilmington*,
  640 F.3d 550 (4th Cir. 2011) .............................................................................17

*Blackwelder Furniture Co. v. Seilig Manuf. Co.*,
  550 F.2d 189 (4th Cir. 1977) .............................................................................30

*Capital Tool v. Maschinenfabrik Herkules*,
  837 F.2d 171 (4th Cir. 1988) ......................................................................13, 21

*Carroll County Ethics Comm'n v. Lennon*,
  119 Md. App. 49, 703 A.2d 1338 (1998) .........................................................48

*Chestnut Real Estate Partnership v. Huber*,
  148 Md. App. 190 (Md. 2002)................................. 14, 22, 23, 24, 26, 30, 46, 51

*Chick-Fil-A, Inc. v. CFT Development, LLC*,
  652 F. Supp. 2d 1252 (M.D. Fla. 2009)............................................................24

*City of Bowie v. Mie Properties*,
  398 Md. 657, 922 A.2d 509 (Md. 2007)................. 37, 38, 39, 40, 42, 43, 45, 51

*Coffman v. James*,
  177 So. 2d 25 (Fla. Dist. Ct. App. 1965) ..........................................................24

*Coleandra v. Wild Lake Community Ass'n Inc.*,
  361 Md. 371, 761 A.2d 899 (2000) ..................................................15, 38, 39, 46

*Deer Valley Resort Co. v. Christy Sports*,
  LLC, No. 2:07-cv-904, 2010 WL 1065940 (D. Utah Mar. 23, 2010)...............21

*DeFord v. Maryland Steel Co.*,
  113 F. 72 (4th Cir. 1902) ...................................................................................30

*Dierker v. Eagle Nat'l Bank*,
  888 F. Supp. 2d 645 (D. Md. 2012)...................................................................31

*Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co*,
  434 Md. 37, 73 A.3d 224 (2013) ................................... 30, 39, 40, 42, 43, 44, 45

*Ebay Inv. v. MercExchange, L.L.C.*,
  547 U.S. 388 (2006)..................................................................................30

*Eisenberg ex rel. Eisenberg v. Montgomery County Public Schools*,
  197 F.3d 123 (4th Cir. 1999) ................................................................16

*Eisenstadt v. Barron*,
  252 Md. 358, 250 A.2d 85 (Md. 1969)......................................23, 30, 38, 39, 51

*Erie R. Co. v. Tompkins*,
  304 U.S. 64, 58 S. CT. 817, 82 L. ED. 1188 (1938) ...................................13, 20

*Grubb v. Guiliford Ass'n Inc.*,
  228 Md. 135, 178 A.2d 866 (1962) .......................................................15, 38, 39

*Harrods Ltd. v. Sixty Internet Domain Names*,
  302 F.3d 214 (4th Cir.2002) ................................................................54

*Kirkley v. Seipelt*,
  212 Md. 127, 128 A.2d 430 (1957) .......................................................46

*Kolon Indus., Inc. v. EI Dupont Nemours and Co.*,
  No 3:11cv6222012 WL 1155218 (E.D. Va. April 5, 2012) ..............................21

*Lewin Realty III, Inc. v. Brooks*,
  138 Md. App. 244, 771 A.2d 446 (Ct. Spec. App. 2001)..................................31

*Markham v. City of Newport News*,
  292 F.2d 711 (4th Cir. 1961) ..............................................................20

*Maryland-National Capital Park and Planning Comm. v. Washington Nat'l Arena*,
  282 Md. 588, 386 A.2d 1216 (Md. 1978)...............................................27, 36, 37

*McLeod v. Stevens*,
  617 F.2d 1038 (4th Cir. 1980) .......................................................13, 20

*Midland Funding LLC v. Brent*,
  No. 3:08CV1434, 2009 WL 3086560 (N.D. Ohio Sept. 23, 2009)...................21

*Mikolasko v. Schovee*,
  124 Md. App. 66 (Ct. Spec. App. Md. 1998) .........................................25, 46

*Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co.*,
  22 F.3d 546 (4th Cir. 1994) ................................................................ 30

*Nader v. Blair*,
  549 F.3d 953 (4th Cir. 2008) .............................................................. 54

*Oladokun v. Grafton Sch., Inc.*,
  182 F. Supp. 2d 483 (D. Md. 2002) .................................................... 41

*Pearl Invs., LLC v. Standard I/O, Inc.*,
  297 F. Supp. 2d 335 (D. Me. 2004) ................................................... 21

*Pierce v. Johns-Manville Sales Corp.*,
  296 Md. 656 (1983) ............................................................................ 31

*Real Truth About Obama, Inc. v. FEC*,
  575 F.3d 342 (4th Cir. 2009) ....................................................... 12, 19

*Redner's Markets, Inc. v. Joppatowne G.P. Limited Partnership*,
  CA. No RDB-11-864 2013 WL 2903285
  (D. Md. June 13, 2013) ........ 13, 14, 16, 20, 21, 22, 23, 25, 26, 27, 28, 29, 46, 51

*Sensormatic Elecs. Corp. v. TAG Co. US*,
  632 F. Supp. 2d 1147 (S.D. Fla. 2008) ............................................. 21

*Sensormatic Elecs. LLC v. Rahle*,
  367 Fed. Appx. 256 (Fed Cir. 2010) ................................................. 21

*Souza v. Columbia Park and Rec. Assoc.*,
  70 Md. App. 655, *cert. denied*, 310 Md. 130 (1987) ................... 25, 46

*Sullivan ex rel. Sullivan v. Vallejo City Unified Sch. Dist.*,
  731 F. Supp. 947 (E.D. Cal 1990) ................................................ 21, 22

*Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.*,
  984 F.2d 113 (4th Cir.) *cert. denied* 508 U.S. 60, 113 S. Ct 2930, 124 L. Ed. 651 (1993) ................................................................................... 17

*Williams v. United States Merit Sys. Protection Bd.*,
  15 F.3d 46 (4th Cir.1994) .................................................................. 16

vii

*Works v. Colvin*,
  519 Fed. Appx. 176 (4th Cir. 2013)............................................................52, 54

## **Statutes**

28 U.S.C. § 1292(a) ..........................................................................................1

28 U.S.C. § 1332 ..............................................................................................1

## **Other Authorities**

13 Moore's Federal Practice §65.07[2] ..........................................................21

4 J.N. Pomeroy, EQUITY JURISPRUDENCE, § 1342 (5th Ed. Spence W.
  Symons ed., 1941) .........................................................................................24

Fed. R. Civ. P. 56(d) ..................................................................................52, 54

## JURISDICTION

This case seeks relief (in the form of reversal and remand for further proceedings) from the district court's December 20, 2013 order granting Defendant White Flint Mall, LLP's partial summary judgment on Count II of Plaintiff's Complaint ("Motion"), and thereby denying Plaintiff's request for injunctive relief. Joint Appendix ("J.A."). J.A. 808. That decision was an interlocutory order denying an injunction within the meaning of 28 U.S.C. § 1292(a). Appellants timely filed a notice of appeal on December 24, 2013. J.A. 810. This Court has appellate jurisdiction to consider this appeal under 28 U.S.C. § 1292(a).

The district court had jurisdiction over this case under 28 U.S.C. § 1332 as the parties are diverse and the dispute in controversy involves claims which exceed $75,000. Plaintiffs are Lord & Taylor LLC and LT Propco LLC (collectively "Lord & Taylor"). Each is a limited liability company whose member is located in Delaware. Defendant White Flint L.P. ("White Flint") is a limited liability limited partnership comprised of partners who do not reside in Delaware. The amount in controversy is satisfied because it involves the taking of Lord & Taylor's property rights which White Flint claims are worth billions.

1

## STATEMENT OF THE ISSUES PRESENTED

I.  DID THE DISTRICT COURT ERR WHEN, SITTING IN DIVERSITY, IT APPLIED THE FEDERAL PROCEDURAL STANDARD FOR THE OBTAINMENT OF A PERMANENT INJUNCTION RATHER THAN APPLYING THE STATE SUBSTANTIVE LAW GOVERNING THE ISSUANCE OF A PERMANENT INJUNCTION FOR THE BREACH OF A RESTRICTIVE COVENANT?

II. DID THE DISTRICT COURT ERR AND MISAPPLY MARYLAND LAW BY CONSIDERING THE COMPARATIVE HARDSHIP TO WHITE FLINT AS A BASIS FOR GRANTING WHITE FLINT'S MOTION?

III. DID THE DISTRICT COURT COMMIT REVERSIBLE ERROR BY FINDING THE COVENANTS SHOULD BE DISREGARDED BECAUSE THE AREA AROUND THE SHOPPING CENTER SITE HAD CHANGED?

IV. DID THE DISTRICT COURT COMMIT REVERSIBLE ERROR BY FINDING AN INJUNCTION WAS NOT JUDICIALLY FEASIBLE WHEN LORD & TAYLOR ASKED THE COURT TO MAINTAIN THE STATUS QUO AND ENJOIN WHITE FLINT FROM CONSTRUCTING ITS SKETCH PLAN WHILE THE PARTIES REA WAS IN EFFECT?

V.  DID THE DISTRICT COURT COMMIT REVERSIBLE ERROR BY PREMATURELY GRANTING WHITE FLINT'S MOTION WITHOUT ALLOWING LORD & TAYLOR TO PERFORM DISCOVERY?

## STATEMENT OF THE CASE

If the district court's Order is permitted to stand, this case will be the first in Maryland to find that equity will *not* intervene to stop the intentional and continuous breach of a party's restrictive covenants – regardless of how egregious or irreparable the breach is.

This appeal arises from Lord & Taylor's attempt to stop White Flint from violating the parties' restrictive covenants and decimating Lord & Taylor's real

2

property rights. Defendant White Flint is bound by restrictive covenants that prohibit it from altering the White Flint Shopping Center Site while the parties' agreement is in effect. White Flint, however, wants to destroy the entire Site and construct an entirely new development irrespective of those covenants. White Flint has not articulated any legal basis, let alone proved one as a matter of law, that permits the abrogation of the covenants.

Restrictive covenants are unique property rights that Courts routinely enforce by way of injunction. In this case, the district court committed reversible error by granting White Flint's premature Motion and precluding Lord & Taylor from enjoining White Flint from violating those covenants. In granting White Flint's Motion, the district court became the first court sitting in Maryland to ever find that a party is powerless to stop another from intentionally breaching restrictive covenants provided that the breach can allegedly be compensated with monetary damages. Such a ruling radically changes the nature of restrictive covenants which are supposed to "run with the land" and completely eliminates a party's right in Maryland to enforce such covenants by way of injunction.

The district court reached this erroneous result by ignoring its duty to apply Maryland law (instead applying federal law), and ignoring requirements under Maryland law. Moreover, it did so by granting a motion for summary judgment filed at the outset of the case, before any discovery was conducted. In so doing, it

reached conclusions as to disputed facts, and failed to allow plaintiff/appellant Lord & Taylor to develop evidence to show other factual disputes. The district court thus erred. Its decision should be reversed, and the case remanded for further proceedings.

**A.** **White Flint Is Bound By Restrictive Covenants That Prohibit It From Destroying The Enclosed Mall, The Common Areas And Lord & Taylor's Parking Lots.**

Lord & Taylor is a national retailer who sells upscale fashion related products to consumers within a certain target market and demographic throughout the United States. J.A. 639. In 1975, White Flint approached Lord & Taylor and Federated (another national retailer who owned Bloomingdale's), about serving as the primary anchor tenants in a mid-sized, regional, first-class enclosed shopping center White Flint sought to construct in Montgomery County, Maryland (the "Shopping Center Site" or "Site"). The Shopping Center Site is commonly known as the "White Flint Mall." J.A. 640.

Lord & Taylor agreed to be a part of the Shopping Center. Lord & Taylor[1] and White Flint, through their predecessors in interest, thus entered into a Construction Operation and Reciprocal Easement Agreement ("the REA"). The REA required White Flint to construct and operate a first class regional retail Enclosed Mall on the White Flint Shopping Center Site ("Site"). J.A. 23. Lord &

---

[1] Adcor Realty Corporation was Lord and Taylor's predecessor in interests.

4

Taylor and Federated were to serve as the two primary long-term retail anchors on the Site.  J.A. 26.

To ensure that it's Store would be successful, Lord & Taylor agreed to a specific design and layout of the Shopping Center, the Common Areas and the parking lots.  This design was generally set forth in the plot plan attached to the REA.  J.A. 113.  Specifically, the REA provided that Lord & Taylor's Store would be (i) constructed to be predominately visible from Rockville Pike; (ii) constructed to be immediately accessible and visible from the primary entrance into the Site; (iii) constructed on interior roads within the Site that allowed customers to easily access Lord & Taylor's store from various directions; (iv) constructed to have two massive parking areas flanking Lord & Taylor's store so that customers could easily park and enter the Enclosed Mall directly through one of Lord & Taylor's store entrances; and (v) constructed at a core location within the Enclosed Mall allowing for maximum pedestrian traffic into Lord & Taylor's Store.  J.A. 114-115; 658-661; 667-673.

In order to ensure these critical and bargained for Site characteristics were maintained as long as Lord & Taylor had its store on the Site, and thereby induce Lord & Taylor to agree to be part of the Shopping Center, White Flint agreed to give up certain developmental controls over the Shopping Center Site.  White Flint covenanted that it would use the Site solely for retail purposes (J.A. 84), and would

5

not alter, change, or modify the Enclosed Mall, the common areas, or the parking

lots used by Lord & Taylor's customers (J.A. 75). Specifically, White Flint

(referred to as "Partnership") agreed to be bound by restrictive covenants for the

life of the REA as follows:

> Partnership agrees that it will not, without first obtaining the prior
> written consent of [Lord & Taylor] and Federated, alter, modify, or
> change the architectural design or the appearance, or change the
> number of floors, size or location, of the buildings within the
> Partnership Tract, or change the size, location or arrangement of the
> Enclosed Mall, the Parking Areas and other Common Areas or
> improvements on the Partnership Tract or Access Easement.
>
> Partnership further agrees that at no time during the term of this
> agreement shall Partnership build or enlarge or change or permit the
> building or enlarging or changing of any buildings or structures on the
> Partnership Tract except as follows: (i) such buildings or structures
> shall be located in the area designated "Mall Stores Building Area"
> [this allows stores within the Enclosed Mall to be constructed], (ii)
> such buildings or structures shall not exceed three (3) floors in height,
> (iii) the aggregate Floor Area of all buildings . . . on the Partnership
> Tract shall not exceed 500,000 square feet of Floor Area of which not
> more than 65,000 square feet of Floor Area shall be designated as
> Mezzanine Areas and not more than 100,000 square feet of Floor Area
> shall be designated as office space and (iv) any construction shall
> conform to and be consistent with outline plans and specifications
> with respect to each such increase which shall be consistent with the
> Plot Plan and with the terms and conditions of this Agreement, and
> such outline plans and specifications shall be first approved by
> Federated and [Lord & Taylor] as herein provided.
>
> Federated and [Lord & Taylor's] right to disprove said plans and
> specifications shall be limited to objections that they do not conform
> to the Plot Plan, do not comply with the provisions of this Agreement,
> or fail to provide for first-class structure, workmanship and materials
> or that the proposed project is not harmonious with the general design

of the improvements on the Shopping Center Site prior to commencement of the proposed project.

J.A. 76.

The parties agreed to similar restrictions with respect to changes that could be made within the parties' respective easement areas and reiterated that "the Enclosed Mall shall not be changed, modified or altered from that shown on the Plot Plan." J.A. 46. Similarly, the parties agreed that no changes shall be made which would unreasonably affect vehicular and pedestrian traffic or the parking ratio required under the REA. J.A. 46.

White Flint further agreed to use the Site only for retail purposes. J.A. 53; 84. Specifically, White Flint agreed to:

> continuously manage and operate the Partnership Tract in accordance with present standards of good regional shopping center operation: (1) as a complex of retail stores, offices (if any) and restaurants (if any) <u>which is part of an Enclosed Mall development</u>, with related Common Area facilities, (2) on a unified basis as a first class high fashion regional shopping center <u>used and occupied *only* for businesses selling goods</u>, wares, merchandise and services <u>at retail</u> of the type customarily sold in such a center and for offices and restaurants and parking incidental thereto <u>and for no other purpose</u>….

J.A. 84 (emphasis added).

White Flint also covenanted that it would not operate the Shopping Center Site in any way which would interfere with Lord & Taylor's business, or with any of the rights granted to Lord & Taylor under the Agreement. J.A. 60-61.

White Flint agreed that the obligations contained in the REA are binding restrictive covenants that run with the land. J.A. 97. <u>The parties further agreed that if any violation of the covenants occurred, Lord & Taylor could seek an injunction and specific performance of those obligations</u>. J.A. 91.

Lord & Taylor relied upon the protections the restrictive covenants afforded. After entering the agreements with White Flint, Lord & Taylor spent millions of dollars constructing and operating a multi-story, 118,200 square foot anchor store at the Shopping Center Site. J.A. 640-641. A massive surface parking lot was constructed immediately at the face of Lord & Taylor's store along with a two story parking garage and pedestrian bridge leading customers directly into Lord & Taylor's store. An extensive road network was constructed around Lord & Taylor's store, giving customers entering into the Site immediate and direct access to Lord & Taylor's store. J.A. 658-661. The road system encircled the Shopping Center Site, allowing vehicles to easily access Lord & Taylor's store from any location on the Site. J.A. 640; 658-661. The Enclosed multi-story Mall was also built and housed over 100 retail tenants; these additional stores served as a draw to the Shopping Center and increased the pedestrian traffic flow into Lord & Taylor's Store. *See id*. Lord & Taylor's store was constructed so that its signature logo was prominently displayed on its building and would be visible from most areas around the Site and to vehicular traffic on Rockville Pike. J.A. 659.

8

Since construction, Lord & Taylor has continuously operated its Store in accordance with the REA and has become a fixture at the White Flint Mall. J.A. 641. Over the last thirty years, Lord & Taylor has built a large customer base in the local community by virtue of its presence, product line, reputation and marketing efforts in the community. *Id*. In short, Lord & Taylor has significantly relied on the restrictive covenants for 35 years. J.A. 667-673; 657-666; 639-645.

**B.     White Flint Decides that It Could Make More Money By Violating the Covenants and Constructing a New Type of Development.**

After operating a retail regional Enclosed Mall on the Site for thirty five years, in February 2012, White Flint submitted a proposed Sketch Plan to Montgomery County seeking to drastically change the White Flint Shopping Center by *demolishing it in its entirety* (with the exception of Lord & Taylor's store, but including the parking lots and common areas serving Lord & Taylor's store) and turning the entire Shopping Center Site into an outdoor "town-center," consisting of 2,400 residential apartments (twelve apartment buildings), three separate high-rise office buildings, a hotel, a school, a park, and only incidental retail space spread over forty-five (45) acres. J.A. 124, 126, 668; 661-665.

White Flint's Sketch Plan unequivocally violates the plain and unambiguous restrictive covenants contained in the REA. J.A. 75. Constructing White Flint's

Sketch Plan[2] will involve not just altering, changing, or modifying the Enclosed Mall, but **demolishing** it entirely, along with the Common Areas, road network, and parking lots currently serving Lord & Taylor's store. J.A. 657-666; 667-673. Lord & Taylor's visibility will be removed, and office buildings will be placed on top of its parking lots. Lord & Taylor's building will be flanked by residential apartment buildings and other non-retail related uses. Lord & Taylor will no longer be the focal point at the entry into the Shopping Center Site. In essence, the entire physical layout, design and improvements currently constructed on the Shopping Center Site will be permanently and irreparably destroyed in violation of Section 6.1(b) of the REA. *See id*.

White Flint concedes its Sketch Plan proposes to build 2,400 residential apartments, offices buildings, a hotel and a school. J.A. 124-164. These are <u>all non-retail</u> uses that are similarly prohibited by the REA. J.A. 84-85; 668; 670; 661-665.

When Lord & Taylor received a copy of the Sketch Plan for the first time in February 2012, it immediately objected pursuant to Section 6.1(b) of the REA. White Flint, in response, assured Lord & Taylor it was simply perfecting its development rights and that:

---

[2] White Flint does not dispute it intends to construct the Sketch Plan (or portions of it) if it receives final site plan approval by the County.

10

the [Sketch Plan] Application should in no way be construed as an expression of White Flint Mall's intention to take any action or undertake any changes at the Mall in violation of the REA. Moreover, it should be noted that WF has undertaken no changes to the Mall in violation of the REA. We are well aware of the parties' respective rights and obligation under both the Lease and the REA, and we have no intention of violating the same.

J.A. 626-627.

These representations, however, were *false*. J.A. 670. White Flint had been systematically taking steps to redevelop the property in clear violation of the restrictive covenants, and began to short-lease or vacate existing mall tenants within the Enclosed Mall. White Flint continued to prepare the Site for redevelopment by knocking down the Bloomingdale's store rather than finding a new retail tenant to replace it. J.A. 181.

Once White Flint informed Lord & Taylor it planned to proceed with its Sketch Plan irrespective of the restrictive covenants, Lord & Taylor immediately filed this suit in the United States District Court for the District of Maryland in order to stop White Flint from violating the covenants. Lord & Taylor sought (1) a declaratory judgment that the White Flint's actions violated the REA ("Count I"); and (2) specific performance and enforcement of the restrictive covenants through a permanent injunction prohibiting White Flint from destroying the Enclosed Mall, Common Areas, and parking areas, and preventing White Flint from constructing its proposed Sketch Plan while the REA is in effect ("Count II"). J.A. 9-21.

11

**C.    White Flint Files a Motion for Partial Summary Judgment Seeking to Dismiss Lord & Taylor's Request for Specific Performance and Injunctive Relief.**

Within eight weeks after being served with the Complaint, and less than four weeks after serving its answer, White Flint, without any discovery taking place, filed a premature Motion for Partial Summary Judgment ("Motion") seeking dismissal of Count II of Lord & Taylor's Complaint. White Flint argued that Lord & Taylor is not entitled to injunctive relief under the *Real Truth About Obama, Inc. v. FEC* standard because Lord & Taylor could receive damages for the taking of its property rights. 575 F.3d 342 (4th Cir. 2009), *vacated on other grounds*, 130 S. Ct. 2371, *reinstated in relevant part on remand*, 607 F.3d 355 (4th Cir. 2010) (per curiam)). J.A. 198-199. Specifically, White Flint claimed that because it was having a difficult time attracting customers to the Enclosed Mall, rather than improve or renovate the property, or change its management style, it was entitled to breach the parties' covenants and construct and entirely new and massively dense development in its place that would allow it to make billions of dollars.

Lord & Taylor opposed White Flint's Motion, raised numerous issues of material fact which should have precluded summary judgment, and cited the correct legal standard that the Court was required to use. Despite this, on December 20, 2013, the district court (Honorable Roger W. Titus) erroneously granted White Flint's Motion. The district court ruled (either explicitly or

12

necessarily by implication) that: (i) that the federal standard for permanent injunctions applied even when courts sit in diversity; (ii) Lord & Taylor had an adequate remedy at law for the decimation of its property rights; (iii) no genuine issues of material facts had been raised by Lord & Taylor; (iv) the affidavit of Steven Silverman from Montgomery County carried more weight than Lord & Taylor's rights as the holder of the restrictive covenant; and (v) the court did not believe granting an injunction was feasible despite the fact that all that was sought by Lord & Taylor was an injunction which would prevent White Flint from destroying the Enclosed Mall and from constructing its Sketch Plan while the parties' REA was in effect.  It is from this ruling that Lord & Taylor appeals.

## <u>SUMMARY OF ARGUMENT</u>

The district court committed reversible error on a number of grounds when it granted White Flint's Motion.  First, the district court used the wrong injunction standard.  Under *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80, 58 S. Ct. 817, 823, 82 L. Ed. 1188 (1938); *McLeod v. Stevens*, 617 F.2d 1038, 1041 (4th Cir. 1980); *Capital Tool v. Maschinenfabrik Herkules*, 837 F.2d 171, 172 (4th Cir. 1988); and *Redner's Markets, Inc. v. Joppatowne G.P. Limited Partnership*, CA. No. RDB-11-864 2013, WL 2903285 at *5 (D. Md. June 13, 2013), the district court was required to apply Maryland state substantive law to determine whether an injunction should issue.  *See id.*  The Court did not do so and improperly

13

considered (i) whether Lord & Taylor would be irreparably harmed if an injunction did not issue, and (ii) whether the public interest supported an injunction. J.A. 801. Neither of these factors, upon which the Court's decision relied, are factors under Maryland law. To the contrary, Maryland law expressly does <u>not</u> require that Lord & Taylor lack an adequate remedy at law in order for an injunction to issue to stop a continued intentional breach of a restrictive covenant. *See Redner's*, 2013 WL 2903285 at *5-6; *Chestnut Real Estate Partnership v. Huber*, 148 Md. App. 190 (Md. 2002). Consequently, finding that Lord & Taylor could not establish irreparable harm because it allegedly could recover damages for White Flint's violations of the covenants was reversible error.

Further, in using the wrong standard, the district court improperly considered Montgomery County's approval of White Flint's Sketch Plan under the "public interest" factor. This was error. The "public interest" is only a factor under the federal test. There is no "public interest" factor under the state permanent injunction standard. To the contrary, Maryland law expressly states that the <u>only</u> equities that should be considered are those of the parties bound by the covenant. *Redner's*, 2013 WL 2903285 at *5.

Second, even if the federal injunction standard was applicable, it was error to grant White Flint's Motion because Lord & Taylor raised numerous fact issues showing that it would be irreparably harmed, that the balance of the hardships

14

weighs in its favor, and Maryland's public interest favored the enforcement of the Parties' bargain by way of injunction.

Third, the district court committed reversible error in considering the comparative hardship to White Flint if an injunction was granted. The amounts of time and money White Flint allegedly spent on preparing its Sketch Plan, knocking down the Bloomingdale's Site, and working with potential new tenants should not be considered under Maryland law because White Flint was aware of the covenants that bound it, yet it took steps to intentionally violate them. As a result, White Flint's comparative hardship should not have been considered. *Colandrea v. Wild Lake Community Assn. Inc*., 361 Md. 371, 397, 761 A 2d. 899, 913 (2000); *Grubb v. Guilford Ass'n. Inc*., 228 Md. 135, 140, 178 A 2d 866, 888 (1962).

Fourth, the district court committed reversible error by summarily finding that the Site had "changed" (in terms of knocking down the Bloomingdale's site and the loss of tenants) and that these changes warranted the abrogation of covenants.

Fifth, the district court committed reversible error by finding that it would not be judicially feasible to simply enforce the four corners of the parties' REA and enjoin White Flint from violating Section 6-1(b) of the REA by: (i) enjoining White Flint from tearing down the Enclosed mall, Common Areas, and parking lots; and (ii) enjoining White Flint from constructing its Sketch Plan. This type of

15

negative injunctive relief is routinely given and does not require any judicial oversight.

Last, the Court committed reversible error by granting White Flint's Motion without allowing Lord & Taylor to conduct necessary discovery to rebut White Flint's claimed equities.

### STANDARD OF REVIEW

This Court reviews the trial court's determination *de novo*.

First, the district court's determination to use the federal standard for obtaining a permanent injunction rather than applying the state substantive law is a question of law. Similarly, whether the district court correctly applied Maryland law, as articulated by the court in its same district in *Redner's Markets, Inc. v. Joppatowne G.P., L.P.*, 2013 WL 2903285 (D. Md. June 13, 2013), is also a question of law. *See Eisenberg ex rel. Eisenberg v. Montgomery County Public Schools*, 197 F.3d 123, 128 (4th Cir. 1999) (denial of injunction reviewed *de novo* when decision is based solely on premise and application of law), citing *Williams v. United States Merit Sys. Protection Bd.*, 15 F.3d 46, 48 (4th Cir.1994), in turn citing *Virginia Carolina Tools, Inc. v. International Tool Supply, Inc.*, 984 F.2d 113, 116 (4th Cir.), *cert. denied,* 508 U.S. 60, 113 S. Ct 2930, 124 L. Ed. 651 (1993).

16

Second, this Court's standard of review in cases involving motions for summary judgment is well-established:

> We review an award of summary judgment *de novo*. *Hawkspere Shipping Co. v. Intamex, S.A.*, 330 F.3d 225, 232 (4th Cir. 2003). Summary judgment is only appropriate "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(a). We construe the evidence in the light most favorable to … the party opposing the … summary judgment motion, and draw all reasonable inferences in his favor. *Hill v. Lockheed Martin Logistics Mgmt., Inc.*, 354 F.3d 277, 283 (4th Cir. 2004) (*en banc*).

*Adams v. Trustees of the Univ. of N. Carolina-Wilmington*, 640 F.3d 550, 556 (4th Cir. 2011).

## ARGUMENT

## I.   THE DISTRICT COURT ERRED WHEN IT APPLIED THE FEDERAL PROCEDURAL STANDARD FOR OBTAINING A PERMANENT INJUNCTION FOR THE BREACH OF A RESTRICTIVE COVENANT.

In order to decide whether to issue a requested injunction, a court first must determine the legal test to be applied. The district court here erred in that initial determination. In finding that an adequate remedy at law existed, the district court seemingly adopted the test urged by White Flint, as stated in *Real Truth About Obama, Inc. v. FEC*. The district court should have used the state substantive law test, which had been articulated just a few months earlier by another court in the same district in *Redner's*. By utilizing the federal test, the Court also disregarded the holdings in *Erie*, *Capital Tool*, and *McLeod* (along with *Redner's*), which

17

unambiguously required the district court to apply Maryland's state substantive law to the issuance of a permanent injunction. Had the court applied Maryland's state substantive law, the issue of whether Lord & Taylor had an adequate remedy at law or whether the injunction favored the public interest would not have been considered and White Flint's Motion would have been denied.

### A. The Trial Court Erred by Using the Federal Procedural Standard for Permanent Injunctive Relief Instead of the State Substantive Law Standard as Required Under *Erie*.

In its Memorandum in Support of Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint ("White Flint's Memo"), and in its argument to the district court, White Flint asserted that in order to obtain injunctive relief, Lord & Taylor had to show the four elements required by the Supreme Court in *Real Truth About Obama, Inc. v. FEC*: (1) that Lord & Taylor will suffer irreparable harm without an injunction, (2) that the balance of equities favors an injunction, (3) that Lord & Taylor is likely to succeed on the merits of its claim, and (4) that an injunction is in the public interest. 575 F.3d 342, 346 (4th Cir. 2009).[3]

White Flint argued that the harm was not irreparable because money damages were an adequate remedy at law. J.A. 726;731;737. White Flint argued

---

[3] White Flint erroneously relied upon the Federal preliminary injunction standard despite the fact that Lord & Taylor was seeking only permanent injunctive relief.

that the equities favored denying Lord & Taylor's request for an injunction because the County allegedly wanted to see the Site redeveloped so that the County could recover increased tax revenues.  J.A. 730, 731.  These arguments are only relevant under the federal test, not the state substantive test.

The district court erroneously accepted the federal injunction standard and in particular found that Lord & Taylor could be compensated by damages, even though they were not sought.  J.A. 800-801.  Following its discussion of the availability of damages, the district court further applied the federal *Real Truth* test by opining that it "was not so sure that the public interest is well served by" an injunction because it appeared that that County had approved White Flint's Sketch Plan.  J.A. 801.

Had the district court applied Maryland's state substantive law to Lord & Taylor's claim, the only elements the Court would have considered are: (i) whether restrictive covenants exist (which was not disputed); (ii) whether the covenants have been or will be breached (the district court presumed breach, as it must at this early stage) by construction of the Sketch Plan; and (iii) whether equity favors the enforcement of the covenants (which Lord & Taylor proved, or at the very least, raised numerous fact issues which should have precluded summary judgment). *Redner's*, 2013 WL 2903285 at *6.  When a court sits in diversity, the question of the relief to which a plaintiff is entitled is a question of substance, not procedure,

19

and thus is governed by state law. *Erie R. Co. v. Tompkins*, 304 U.S. 64, 80, 58 S.

Ct. 817, 823, 82 L. ED. 1188 (1938); *McLeod v. Stevens*, 617 F.2d 1038, 1041 (4th

Cir. 1980), citing *Markham v. City of Newport News*, 292 F.2d 711, 718 (4th Cir.

1961). As the Fourth Circuit held in *McLeod v. Stevens*,

> The proper remedy for the harm McLeod suffered is a question of substance that is governed by state law.
>
> Judge Haynsworth explained the principle underlying this conclusion in *Markham v. City of Newport News*, 292 F.2d 711, 718 (4th Cir. 1961):
>
> The . . . doctrine (of *Erie R.R. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817, 82 L.Ed. 1188 (1938)) does not extend to matters of jurisdiction or, generally, to matters of procedure. Its basic philosophy is that a federal court exercising its diversity jurisdiction to adjudicate rights created by the state sits as another court of that state and should reach the same result as the state courts would reach in deciding the identical issue. It is conformity in result which is required.
>
> Thus, to avoid serious differences in outcome, we must determine and follow the probable remedial treatment McLeod would have received in a state court.
>
> *Id*. at 1041 (citation omitted).

This principle was articulated again in *Capital Tool*, where the Fourth

Circuit held that when a court sits in diversity and a *permanent* injunction is

sought, the state substantive law governs the relief sought. *See Capital Tool and*

*Mfg. Co., Inc. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172 (4th Cir. 1988)

(holding "there is no reason to exclude from *Erie* state substantive law regarding

the issuance of final injunctions").

20

The holdings in *McLeod* and *Capital Tool* are consistent with those of other courts which have consistently held that state laws governing equitable remedies, including permanent injunctions, are substantive and must be applied by federal courts sitting in diversity. *See, e.g.*, *Redner's*, 2013 WL 2903285 at *2; *Kolon Indus., Inc. v. EI DuPont Nemours and Co.*, No 3:11cv6222012 WL 1155218 (E.D. Va. April 5, 2012); *Pearl Invs., LLC v. Standard I/O, Inc*. 297 F. Supp. 2d 335, 337 (D. Me. 2004); *Sullivan ex rel. Sullivan v. Vallejo City Unified Sch. Dist.*, 731 F. Supp. 947, 956 (E.D. Cal. 1990); *Deer Valley Resort Co. v. Christy Sports*, LLC, No. 2:07-cv-904, 2010WL 1065940, at *4 (D. Utah Mar. 23, 2010); *Midland Funding LLC v. Brent*, No. 3:08cv1434, 2009 WL 3086560 (N.D. Ohio Sept. 23, 2009); *Sensormatic Elecs. Corp. v. TAG Co. US,* 632 F. Supp.2d 1147 (S.D. Fla. 2008), *affd in part sub nom Sensormatic Elecs. LLC v. Rahle*, 367 Fed. Appx (Fed Cir. 2010); 13 Moore's Federal Practice §65.07[2].

The District Court in *Pearl Invs.,* succinctly stated the importance of applying the state substantive law rather than the federal law in deciding permanent injunctive relief:

> A permanent injunction is a creature of equity designed to enforce substantive law rights. 7 Moore's Federal Practice, Pt. 2, para. 65.18[1]. In this sense, the availability of injunctive relief is an integral component of the substantive law right. Where federal courts are called upon to adjudicate a claim predicated on state law, under either its diversity or pendent claim jurisdiction, there appears to be no question that the ultimate issue of whether injunctive relief may issue must be decided under applicable state law. *Id.* **Were the rule**

**otherwise, a substantial risk that different outcomes could be achieved in state and federal court would be presented in direct violation of the *Erie* doctrine**.

731 F. Supp. at 956 (emphasis added).

Thus, the district court in this case committed error when it applied the federal standard to the relief sought by Lord & Taylor and erred by requiring Lord & Taylor to show irreparable harm and that the injunction was in the public's interest. These two factors are not required under the Maryland permanent injunction standard. *See Redner's* 2013 WL 2903285 at *5; *Chestnut* 811 A. 2d 398-399.

Consequently, the district court violated *Erie*, *Capital Tool*, and *McLeod*, and committed reversible error by applying the federal law permanent injunction standard to the relief sought by Lord & Taylor, when the state substantive law standard for enjoining a breach of a restrictive covenant should have been applied.

## B. Irreparable Harm Need Not Be Shown Under Maryland Law for a Permanent Injunction to Issue.

Use of the correct standard—Maryland substantive law instead of federal law—is not an academic exercise because the two standards differ significantly. As stated *supra*, unlike the federal standard for issuance of a permanent injunction, the Maryland standard for issuing an injunction for a breach of a restrictive covenant only requires a showing of three factors: (i) that restrictive covenants exist; (ii) a breach of those covenants has occurred or will occur; and (iii) equity

22

favors enforcement of those covenants. *See Redner's,* 2013 WL 2903285 at *5; *Chestnut*, 148 Md. App. at 208-209.

Unlike the federal law in Maryland, a permanent injunction is the appropriate remedy for a violation of a restrictive covenant, *without* any showing of irreparable harm because damages are presumptively insufficient for the violation of a party's property right. *See Chestnut*, 148 Md. App. at 190; *Eisenstadt*, 252 Md. at 371 (directing the chancellor on remand to issue a mandatory injunction for an intentional breach of restrictive covenants without requiring irreparable harm to be shown).

Specifically, the Maryland Court of Special Appeals has adopted the rule stated in Pomeroy's Treatise on EQUITY JURISPRUDENCE, that injunctions are routinely granted "almost as a matter of course" upon breach of the covenant.

> The amount of damages, and even the fact that plaintiff has sustained any pecuniary damages, are wholly immaterial…."it is clearly established by authority that there is sufficient [harm] to justify the court interfering, if there has been a breach of the covenant….The moment the court finds that there is a breach of the covenant, that is an injury, and the court has no right to measure it, and no right to refuse to the plaintiff the specific performance of his contract, although his remedy is …an injunction."

*Chestnut*, 148 Md. App. at 211, citing 4 J.N. Pomeroy, EQUITY JURISPRUDENCE, § 1342 at 942-3 (5th Ed. Spence W. Symons ed., 1941) (quoting *Leech v. Schweder*, L.R. 9 Ch. App. 462, 465, note 468).

23

Similarly, the Maryland Court of Appeals agreed with the holding articulated in *Coffman v. James* which states:

> It is well established in this jurisdiction that even in the absence of a showing of irreparable injury, injunctive relief is grantable as a matter of right, subject only to sound judicial discretion, to restrain the violation of a restrictive covenant affecting real estate. It is the theory of the law that every piece of land has peculiar value, infringement of which is not readily remedial by the assessment of damages of law.

*See Chestnut*, 148 Md. App. at 209-210, *citing Coffman v. James*, 177 So. 2d 25, 31 (Fla. Dist. Ct. App. 1965) (citation omitted); *accord Chick-Fil-A, Inc. v. CFT Development, LLC,* 652 F.Supp. 2d 1252 (M.D. Fla. 2009).

Consequently, by considering irreparable harm (and indeed granting White Flint's Motion on the basis that Lord & Taylor allegedly could not establish irreparable harm because damages could adequately compensate it) the district court used a factor that is not part of the test it was required to apply. This was not harmless error, and the district court's decision should be reversed.

## C. The District Court Committed Reversible Error By Utilizing the Federal Permanent Injunction Standard and Considering the Alleged "Public Interest" In Seeing the Covenants Breached.

In addition to improperly considering irreparable harm, the district court erroneously ruled that an injunction should not be issued in this case because it would not be in the public's interest, in particular the County's purported interest. J.A. 801. The "public interest" factor, however, like that of irreparable harm, is <u>not</u> part of the test under Maryland law. *See Redner's*, 2013 WL 2903285 at *5.

24

As stated in *Redner's*, "where a court finds that a restrictive covenant has been breached, a permanent injunction may be granted 'on the basis of the strength of the circumstances and equities of <u>each party</u>.'" *See id.* Restrictive covenants, such as those at issue here, are matters of <u>private</u> rights that are not affected by the County's actions. *Mikolasko v. Schovee*, 124 Md. App. 66, 88 (Ct. Spec. App. Md. 1998). The County's general desire to see the entire White Flint Sector (an area comprising over 450 acres, of which the Site constitutes less than 10%) redeveloped so that the County can receive additional tax dollars is irrelevant. *See id.* ("[N]otwithstanding local governmental approval of a resubdivision plan, injunctive relief is entirely appropriate for violations of private covenants and restrictions," (*citing Souza v. Columbia Park and Rec. Assoc.*, 70 Md. App. 655, 657, *cert. denied*, 310 Md. 130 (1987)). Instead, it is only the equities of the parties who are bound by the restrictive covenant that should be considered. *See Redner's*, 2013 WL 2903285 at *5; *Chestnut,* 148 Md. App. at 206, 811 A.2d at 399.

Because there is no "public interest" test under the Maryland permanent injunction standard, the Court committed error by considering and relying upon Montgomery County's purported interest in seeing the private covenants abrogated, and the County's approval of the Sketch Plan.

**D.    Applying the Correct, Maryland Substantive Law, Standard Results in the Issuance of an Injunction, or at a Minimum Denial of White Flint's Motion.**

The Maryland substantive law standard for an injunction includes three elements: (i) whether restrictive covenants exist; (ii) whether the covenants have been or will be breached by construction of the Sketch Plan; and (iii) whether the equities between the parties favor the enforcement of the covenants. *Redner's*, 2013 WL 2903285 at *6. Sufficient evidence was presented to show that an injunction should issue to enforce the restrictive covenants, or, at a minimum, that factual issues exist which preclude summary judgment. *Id.*

Concerning the first element, it is undisputed that restrictive covenants exist. J.A. 76-77. Concerning the second element, White Flint did not meaningfully argue a lack of breach, and indeed, the district court presumed an intentional breach (as it had to at this early stage). J.A. 798. Clearly the district court's assumption was correct. Demolishing the Enclosed Mall, Lord & Taylor's parking lots, and the majority of the common areas, and replacing them with residential and office buildings, a hotel and a school (all of which are non-retail and thus prohibited uses) unequivocally violate the express terms of the restrictive covenants in the REA. J.A. 76-77; 667-673; 674-686; 639-647. Thus, the first two elements under Maryland law for issuance of an injunction were met.

Concerning the third element, Lord & Taylor produced competent evidence that showed that the equities between the parties favored the enforcement of the covenants.  As stated in *Redner's*:

> Maryland law strongly favors upholding the intent of contracting parties through enforcement of contractual terms.  For this reason, enforcement of the restrictive covenant should be denied "*only* where the factors that argue against implementing the particular provision *clearly and unequivocally outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the contested term.*

*Redner's*, 2013 WL 2903285 at *6, citing, *Md.-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Area*, 285 A.2d at 1233 (emphasis added).

White Flint knew that its Sketch Plan violated the parties' REA, but it initially informed Lord & Taylor that it had no intent to alter or change the Enclosed Mall or violate the REA in any way.  J.A. 626-627.  Despite its representations, White Flint took active steps behind Lord & Taylor's back to begin ridding the mall of its tenants so that White Flint could pursue redevelopment according to its Sketch Plan.  J.A. 671.  Lord & Taylor further showed in detail how all of the currently bargained for site characteristics that are protected by the restrictive covenants favor it, and how it would be irreparably harmed if the mixed use development in White Flint's Sketch Plan was constructed.  J.A. 657-666; 667-673; 648-656.  In addition to meeting its burden of

27

proof as required by *Redner's* and Maryland law, Lord & Taylor presented evidence refuting (or at least raising issues of fact as to) the purported equities of White Flint, and undermining the excuses offered to violate the covenants. J.A. 639-647; 667-673;674-687; 648; 656. Thus, summary judgment should have been denied.

**E.    Granting White Flint's Motion Created a Split in the Law Concerning What Must Be Shown in Order to Permanently Enjoin the Breach of a Restrictive Covenant.**

Granting White Flint's Motion was also contrary to the district court of Maryland's own precedent regarding these same facts and legal issues. In *Redner's*, Redner's Markets, a tenant, sued Joppatowne, the landlord, for violating the parties' restrictive covenants and asked the district court to enjoin the defendant from leasing any space to Redner's competitors that were located within a five mile radius of Redner's store. 2013 WL 2903285 at *1. Just as here, the district court had to determine what law applied to Redner's claim for injunctive relief, and accordingly whether irreparable harm needed to be shown. *Id.* at *2-3. Correctly following Supreme Court and Fourth Circuit precedent, the district court held that Maryland's state substantive law applied. *Id.* at *5. Applying Maryland law, the court found that because restrictive covenants involved unique and valuable property rights, irreparable harm need not be shown. *Id.* at *5-6. Instead, all that must be shown is for an injunction to issue to stop a breach of restrictive

covenants is: (i) that covenants exist; (ii) that there is a breach of those covenants; and (iii) that the equities favor enforcement. *Id.* at *6. Such a showing is akin to that necessary for specific performance. *Id.*

In this case, however, the district court disregarded the correct standard as articulated in *Redner's*, and instead applied a completely different standard to Lord & Taylor's claim for an injunction, imposing both a public interest and irreparable harm requirement. In so doing, the district court has become the first Maryland court to hold that federal law applies to claims for permanent injunctive relief when a court sits in diversity. Such a holding is at odds with *Erie* and this Court's own precedent. Moreover, by granting White Flint's Motion, the district court has put all holders of restrictive covenants in jeopardy of such covenants being willfully disregarded at any time, subject only to alleged monetary compensation for the breach. Such a policy stands the effectiveness of restrictive covenants on their heads and breaks with well settled Maryland law. Consequently, the district court committed reversible error by failing to follow its own precedent in *Redner's* and by failing to comply with existing federal and state law. *Chestnut*, 811 A.2d at 401; *Eisenstadt*, 252 Md. at 371; *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co*, 434 Md. 37, 68,73 A.3d 224, 242 (2013).

29

**F.     White Flint's Motion Should Have Been Denied Even Using the Federal Injunction Standard.**

Even if the federal procedural standard applied to the relief sought by Lord & Taylor, which it does not, Lord & Taylor raised sufficient issues of fact under the federal standard so that summary judgment should have been denied. Lord & Taylor showed: (i) it has suffered and will suffer irreparable injury for which damages are inadequate, (ii) the balance of the hardships favors Lord & Taylor, and, (iii) the public interest would not be disserved by issuing an injunction. *See ebay Inv. v. MercExchange, L.L.C.*, 547 U.S. 388, 391 (2006).

**(i)     Lord & Taylor Will Be Irreparably Harmed.**

Lord & Taylor does not have an adequate remedy at law for the intentional taking of its bargained-for property rights. It is well settled that damages will not be awarded, and therefore cannot be adequate, when their calculation would be based upon numerous uncertain events, contingencies, and unknowns. *See DeFord v. Maryland Steel Co.,* 113 F. 72 (4th Cir. 1902); *Multi-Channel TV Cable Co. v. Charlottesville Quality Cable Operating Co*., 22 F.3d 546, 551 (4th Cir. 1994); *Blackwelder Furniture Co. v. Seilig Manuf. Co*., 550 F.2s 189, 196 (4th Cir. 1977) (damages are not calculable if they will affect good will and the reputation of a retailer in that you cannot predict how customer's dissatisfaction with change will affect the retailer); *Dierker v. Eagle Nat'l Bank*, 888 F. Supp. 2d 645 (D. Md. 2012) ("damages must be reasonably certain and not based on speculative, remote

30

or uncertain figures") (citation omitted); *Lewin Realty III, Inc. v. Brooks*, 138 Md. App. 244, 771 A.2d 446, 467 (Ct. Spec. App. 2001) (stating "future damages cannot be recovered if the future consequences upon which the damages are premised are mere possibilities") (citing, *Pierce v. Johns-Manville Sales Corp*., 296 Md. 656, 666 (1983)).

There is no reasonable method by which Lord & Taylor can possibly calculate how it will be harmed in the next forty years by the taking of its property rights. This is not a simple case where, for example, a competitor has wrongfully moved into the Enclosed Mall and is competing for Lord & Taylor's business while all other variables remain the same. Instead, every single site characteristic that Lord & Taylor bargained for is being irreparably destroyed and Lord & Taylor will be forced to operate for the next forty years in a development it never agreed to be a part of and which does *not even currently exist*.

First, White Flint's Sketch Plan is purely conceptual at this point. White Flint can only build what ultimately is set forth in a *final development plan* and subdivision plat plan approved by Montgomery County. J.A. 674-687. White Flint has yet even not submitted a final development plan or a subdivision plat to the County for review, let alone had such plans approved by the County and the public. *Id*. Until such final approval is given to a final development plan, no one can know, for example, what buildings White Flint will build, what their size will

31

be, where they will be located, what uses and buildings will be placed next to Lord & Taylor's store, what density will be permitted on the Site, how many phases will be constructed, whether White Flint will have adequate financing to construct all phases, what uses will be permitted on the Site and where the retail as compared to other uses will be placed, what the configuration of the roads leading into and around Lord & Taylor's store will be, what the planned pedestrian flow will be, or where Lord & Taylor's customers will be permitted to park over the course of the next forty years. *Id.* In short, without knowing what will be built, it is impossible to calculate how such changes will impact Lord & Taylor for the next 40 years.

Second, assuming without knowing whether White Flint's Sketch Plan will ever be constructed, every site characteristic for which Lord & Taylor bargained and relied upon when it signed and performed under its lease will be destroyed. J.A. 657-666. Lord & Taylor's parking lots will be replaced with office and apartment buildings. *See id.* There will no longer be pedestrian bridges bringing customers directly into Lord & Taylor's store. *See id.* There will no longer be pedestrian traffic from the Enclosed Mall into Lord & Taylor's store because the Mall, which is still standing, will be demolished. J.A. 663. Lord & Taylor will no longer be visible from the primary road that serves the development as three office buildings will block the view of its store. *Id.* Lord & Taylor will not be at the front of the new development but instead will be hidden behind new non-retail

32

buildings that will dwarf Lord & Taylor's store.  *See id.*; J.A. 648-656.  It is not known how any of these changes will effect of Lord & Taylor's operations.

It also cannot be known how long construction will last, where pedestrian traffic will come from, how the new uses will affect Lord & Taylor's store, whether there will be sufficient residential housing and office demand over the next forty years to satisfy the uses proposed on the Site and whether those uses will funnel traffic into Lord & Taylor's store, how vehicular and pedestrian traffic will flow around or into to Lord & Taylor's store as new roads and entrances are constructed, during White Flint's construction period and thereafter, and how Lord & Taylor's store will be affected during all phases of construction and while they tear down the Enclosed Mall, and whether Lord & Taylor's customers will venture through the construction zone to continue to shop at Lord & Taylor's store.

There also is no way of knowing:  (i) how customers will treat Lord & Taylor's store in White Flint's new mixed use development when eighty percent of the Site is covered in non-retail uses; (ii) how Lord & Taylor's customer demographic may change with the new uses on the Site; (iii) whether Lord & Taylor's store, as currently constructed, will appeal to new shoppers on the Site or will appear to be an archaic relic compared to the new construction and uses; and (iv) what competition Lord & Taylor will face in the new mixed use community.

33

Thus, it is impossible to predict the impact that all of these changes will have on Lord & Taylor's store for the next 40 years. There are simply too many uncertainties and unknown variables. While White Flint claims "historical sales" figures somehow contain the "magic recipe" for calculating how Lord & Taylor will be harmed in the future, such figures are not meaningful here because the site conditions for which they were created will no longer exist once the Site is destroyed; moreover, the future sales figures for which historical sales may be used as a comparator are, as demonstrated above, simply too speculative and uncertain to quantify. Because there is no reasonably certain way to calculate how the taking of Lord & Taylor's property rights in conjunction with White Flint's proposed redevelopment plan will impact Lord & Taylor for the next *forty years*, any attempt to calculate lost profits would be based solely on sheer conjecture and speculation. As a result, Lord & Taylor has no adequate remedy at law for the decimation of its property rights.

### (ii)    The Hardships Weigh In Lord & Taylor's Favor

Proper weighing of the hardships unequivocally tips in Lord & Taylor's favor because it is undisputed that White Flint is intentionally and irreparably destroying every site condition Lord & Taylor bargained for in the REA. Lord & Taylor presented the declarations of numerous witnesses who described the site characteristics it bargained for, how Lord & Taylor relied upon those

characteristics over the last thirty years, and how Lord & Taylor would be irreparably harmed if White Flint were permitted to destroy the entire shopping center and hold Lord & Taylor hostage in a new development. *See* J.A. 639-647; 667-673; 648-656, 657-666. Because of White Flint's violations of the covenants through its proposed construction of the development in its sketch plan, Lord & Taylor's store would be lost in a sea of prohibited non-retail uses. *See id.*

The hardship to White Flint by comparison is lacking. First, if a court issued an injunction, it would not be precluding White Flint *forever* from redeveloping the Site. To the contrary, White Flint can redevelop the property once the period during which it agreed not to redevelop it, the term of the parties' REA, ends. Second, issuing an injunction would not require White Flint to do anything other than leave the Site as is until the term of the agreement is over. Certainly, if White Flint wishes to make the property more lucrative within the bounds of the party's agreement, it is free to do so whether by renovating the property or coming up with a new plan that does not violate the covenants. Third, the money spent by White Flint on its concept plan will not go to waste. It has already received approval for its Sketch Plan and that approval will allow it to take further steps with the County in the future to obtain additional entitlements. Those entitlements, which White Flint is not precluded from seeking, are valuable rights and can be put to use once the REA has expired. Finally, it cannot be forgotten that any steps White Flint has

35

taken thus far were its own choices, made with knowledge of the restrictions to which White Flint agreed in the REA.

### (iii)    Public Interest Favors the Injunction

Maryland has a strong public policy which favors and encourages Courts to enforce private party bargains.  As stated by the Court of Appeals in *Maryland-National Capital Park and Planning Comm. v. Washington Nat'l Arena*:

> Fearing the disruptive effect the invocation of the highly elusive public policy principle would likely exert on the stability of commercial and contractual relations, Maryland Courts have been hesitant to strike down voluntary bargains on public policy grounds, doing so only in those cases where the challenged agreement is patently offensive to the public good, that is, where 'the common sense of the entire community would…pronounce it' invalid.  This reluctance on the part of the judiciary to nullify contractual arrangements on public policy grounds also serves to protect the public interest in having individual exercise broad powers to structure their own affairs by making legally enforceable promises, a concept which lies at the heart of the freedom of contract principle.

282 Md. 588, 606, 286 A.2d 1216 (Md. 1978).

The public interest thus is served by holding White Flint and Lord & Taylor to the terms of their bargain, and enforcing the covenants as written.  *See id*. Moreover, public policy does not yield to save White Flint from its prior decision to be bound by the parties' covenants, even though White Flint may now regret agreeing to those covenants.  *City of Bowie v. MIE, Prop. Inc.*, 398 Md. at 657, 683 (Ct. App. Md. 2007).

36

White Flint's claim that only its concept plan could satisfy the County's larger goal in promoting development across the entire White Flint area is both legally inadequate to overcome the strong interest in enforcing covenants as written, and factually unproven as a basis for summary judgment. There are numerous other developmental possibilities on the Site that are available to White Flint that do not involve violating the restrictive covenants. J.A. 674-688. In addition, Lord & Taylor presented evidence, and thereby raised factual issues, showing that the County's goals for the general area were being met by other land owners. *Id*. Finally, the County cannot claim it will be harmed if development does not occur as White Flint has planned because the County knew of Lord & Taylor's rights over the Site when it adopted the White Flint Sector Plan. *Id.* The County's own plan itself states Lord & Taylor's rights may preclude development. *Id.* Thus, at the very least, Lord & Taylor raised fact issues which should have precluded summary judgment.

## II.    THE DISTRICT COURT ERRED AND MISAPPLIED MARYLAND LAW BY CONSIDERING THE COMPARATIVE HARDSHIP TO WHITE FLINT

In granting White Flint's Motion, the district court referenced the alleged hardship that would befall White Flint if an injunction issued due to the sums it spent thus far in attempting to carry out its Sketch Plan. J.A. 801. White Flint also argued it would be inequitable for the court to stop it from violating the covenants

because it had already removed the Bloomingdale's store and vacated tenants, facts which the district court also noted. J.A. 799-800.

It is well settled under Maryland law, however that the hardship to a defendant who intentionally violates restrictive covenants <u>cannot be considered</u>. *City of Bowie*, 398 Md. at 688; *Eisenstadt*, 252 Md. at 371, 250 A.2d at 92; *Colandrea v. Wilde Lake Community Assoc.*, 361 Md. 371, 397-8 (Md. 2000) (giving a lengthy overview of cases in Maryland which repeatedly have rejected the comparative hardship on the party who has intentionally breached restrictive covenants); *Grubb v. Guilford*, 228 Md. 135, 178 A.2d. 886 (Md. 1962). The district court assumed that White Flint intentionally violated the covenants. J.A. 798. That assumption was correct, as a comparison of the covenants to the Sketch Plan clearly showed that the Sketch Plan did not conform to White Flint's obligations. J.A. 23-122; 123-164. The Court thus could *not* consider the purported hardship to White Flint of being compelled to comply with the restrictive covenants to which it bound itself. *See Colandrea*, 361 Md. at 397-8; *Grubb*, 228 Md. at 135; *Eisenstadt v. Barron*, 252 Md. 358, 371, 250 A.2d 85, 92 (Md. 1969) (refusing to consider the purported hardship of a party violating the restrictive covenants because the breaching party was aware of the covenants and took steps to violate them both before and after objections were made to him doing

38

so).  By considering this purported hardship, the district court misapplied Maryland law and committed reversible error.

## III.  THE DISTRICT COURT ERRED BY FINDING THE COVENANTS SHOULD BE DISREGARDED BECAUSE THE AREA AROUND THE SHOPPING CENTER SITE HAD "CHANGED."

In granting White Flint's Motion the district court stated that there had been changes in the White Flint area.  J.A. 799-800.  By relying on alleged changed circumstances, the district court erred in several ways:  (i) it considered an argument not raised by White Flint, (ii) which, accordingly, was not supported by any evidence, and (iii) it misapplied the relevant law.

In order to set aside covenants on the basis of a radical change in circumstances, the changed circumstances need to be so significant in nature that they override the purpose of the covenants and are inconsistent with it.  *City of Bowie v. MIE Prop.*, Inc., 398 Md. 657, 922 A.2d 509 (Md. 2007); *Dumbarton Improvement Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 434 Md. 37, 73 A.3d 224 (2013).  The changes must result from "objective factors outside the property owner's control."  *City of Bowie*, 398 Md. at 687, 922 A.2d at 527.  The changes must be "such that the covenant cannot achieve the purpose for which it was created."  *Dumbarton*, 434 Md. at 63, 73 A.3d at 239.  That standard was not met here.

### A.     White Flint Did Not Move for Summary Judgment on This Affirmative Defense.

A party wishing to set aside covenants on the basis of changed circumstances bears the burden of proof, akin to that of an affirmative defense, to establish that the doctrine applies. *See City of Bowie*, 398 Md. at 685. The Maryland Court of Appeal has explained:

> "[o]nce the proper existence and purpose of a restrictive covenant is established, the onus falls on the party seeking its annulment to demonstrate that, notwithstanding the clear purpose, the covenant should no longer be recognized as valid and enforceable."

*Id*.

White Flint did not even attempt to make the required showing because it never moved for summary judgment on the basis that the parties' restrictive covenants should be abrogated due to a radical change in circumstances. Having not made the argument, White Flint never presented any evidence, much less established with undisputed summary judgment evidence, that any alleged changes in the White Flint area were inconsistent with the parties' restrictive covenants. Instead, White Flint's motion focused only on the lack of irreparable harm, and the alleged public interest under the federal procedural standard. Thus, it was error to grant summary judgment on a ground falling outside White Flint's own Motion. *See Oladokun v. Grafton Sch., Inc.*, 182 F. Supp. 2d 483 (D. Md. 2002) (claim not raised in summary judgment motion is not to be considered).

40

**B.** **White Flint Did Not Meet Its Burden of Proof to Establish a Radical Change in Circumstances Has Occurred, and at the Very Least, Fact Issues Exist Which Should Have Precluded Summary Judgment.**

Not only did White Flint fail to present evidence establishing a radical change in the area immediately surrounding the Mall had occurred such that the objective and purpose of the restrictive covenants could no longer be met, but the available evidence showed that the standard **could not** be met. At a minimum, the evidence showed that there are fact issues that prevent resolution by summary judgment.

The objective of the covenants was, and is, clear. The parties intended that only a regional retail Enclosed Mall Shopping Center would be constructed and operated on the Site until the term of the Agreement expired. J.A. 84 - 85. White Flint did not present evidence – let alone uncontradicted evidence – showing that a dramatic change in the neighborhood around the Mall occurred so that the covenants' purposes, cannot be obtained. Indeed, White Flint's objective is to continue to have over one million square feet of retail shopping on the Site. In short, White Flint simply wants to operate what it thinks will be a more lucrative site by demolishing the "enclosed" mall and constructing an "outdoor" multi-use center. That plan negates – rather than demonstrates – that any radical change in circumstance has occurred which would warrant the abrogation of Lord & Taylor's

restrictive covenants on the Site. *See Dumbarton*, 434 Md. at 62-68; 73 A.2d 238-242.

Moreover, White Flint did not present any summary judgment evidence demonstrating (as a matter of law) why the restrictions against non-retail use on the Shopping Center Site should be abrogated. White Flint did not show, for example, that there is a housing shortage in the area, or that that residential housing has so taken over the area that allowing residential use on the Property is now necessary. Not only is such evidence absent from White Flint's summary judgment motion, any such notions are expressly contradicted by Mr. Kline who testified that there is no need for residential housing units to be developed on the Shopping Center Site because numerous other owners are already in the process of constructing residential housing in the White Flint Sector area. J.A. 674 - 787.

The only change to which White Flint pointed is that because the County passed the White Flint Sector plan, White Flint will be able to make billions of dollars more by redeveloping the property rather than abiding by its covenants. (White Flint's counsel at oral argument. "We are talking … billions of dollars in tax revenue." J.A. 732.) Such a claim is of no legal consequence. *See City of Bowie*, 398 Md. at 682, 922 A.2d at 525 (stating the fact that the land subject to a restrictive covenant would be more valuable without the restrictions does not factor

42

into the effectiveness of the covenant); *Dumbarton*, 434 Md. at 67-68; 73 A.2d at 241-242.

First, the fact that the County passed the White Flint Sector Plan does not indicate a radical change in circumstances. To the contrary, the County's White Flint Sector Plan – which pertains to 450 acres of land as opposed to just the Shopping Center Site – is a multi-decade plan representing what the County's prospective goals for the area as a whole tied to mass transit. J.A. 674-687. Furthermore, a prospective plan is not a changed circumstance that CURRENTLY EXISTS, as is necessary to effectively override inconsistent covenants. *City of Bowie*, 398 Md. 685-692, 922 A.2d at 526-530.

Second, the fact that White Flint might make more money if it is released from its prior commitments is not a changed circumstance that provides grounds for abrogating the restrictive covenants. The Maryland Court of Appeals in *Dumbarton* considered arguments similar to those that have been generally alleged by White Flint in this case, and upheld covenants that were over 100 years old because the objective of the covenants could still be fulfilled irrespective of the claimed change in circumstances. In *Dumbarton*, the owner of a cemetery sought to sell 200 acres of his property to a developer to use to build residential units on the property. The 200 acres was subject to a restrictive covenant that required that the land only be used for a cemetery and no other use. 434 Md. at 68, 73 A.3d at,

43

242.  The neighborhood association in and around the cemetery challenged any sale stating that the purpose of the covenants was still valid and the restrictive covenants were binding on its owner.  *Id.*

The owner, however, argued that the neighborhood around the cemetery had radically changed and that a dramatic increase in the population had occurred warranting the need for more residential housing.  *See id*.  The owner also used aerial photographs to show that what was once a largely agrarian and sparsely populated area had become a densely populated commercial hub.  *See id*.  The respondents also noted the current use of the Cemetery as a shortcut between area arterial roads to other residential subdivisions.  *See id*.  The Court of Appeals, however, found that that there was no nexus between the demographic and economic changes that had taken place and the abrogation of the covenants. Because the land could still be used as a cemetery in the area, then circumstances had not sufficiently changed so as to warrant the abrogation of the covenants.

The Court of Appeals also stated that the fact that the owner of the property could *make more money without the covenants* due to the housing bubble in the area *was of no legal consequence as "ensuring the best fiscal outcome is not the test for the ongoing validity of a covenant*."  434 Md. at 67, 73 A.3d at 241 (emphasis added).  Courts should not, as the Court of Appeals warned, "invalidate

44

plainly written [restrictive] covenants to save a party from what may [later] prove to be a poor business decision." *Id.* citing *Bowie*, 398 Md. at 683, 922 A.2d at 525.

White Flint is seeking relief akin to the landowner in *Dumbarton*, but without even attempting to make the requisite showing as attempted in *Dumbarton*. White Flint cannot carry its burden as none of the changes in the vicinity of the Mall frustrate the covenant's ability to achieve the purpose expressed in its language or affect its ongoing validity. *See Dumbarton*, 434 Md. at 68, 73 A.3d at 242.

Finally, the radical change in circumstances complained of in the area that warrants the abrogation of the covenants must be caused by factors <u>outside of White Flint's own control</u>. *See id*. Here, although White Flint complains that the Mall turned into "a turkey" and that Bloomingdale's is no longer standing, those changes were caused by the actions of White Flint – not the community surrounding the Shopping Center Site. J.A. 639 - 674. White Flint does not dispute that it demolished Bloomingdale's store nor does it dispute that it drove out the mall's retail tenants. J.A. 181; 639 - 647. Because these changes were not outside of White Flint's control, they cannot be used as a justification to allow White Flint to unilaterally breach the restrictive covenants. *See Bowie*, 398 Md. at 687, 922 A.2d at 527.

45

Accordingly, there is no evidence of radically changed circumstances that could justify setting aside the restrictive covenants requiring White Flint to operate a retail Enclosed Mall Shopping Center, and prohibiting other uses, and it was reversible error by the court to grant summary judgment on this basis.

## IV.   THE DISTRICT COURT ERRED BY FINDING AN INJUNCTION WAS NOT JUDICIALLY FEASIBLE.

In Count II, Lord & Taylor asked the Court to enforce restrictive covenants by:  (i) preventing White Flint from destroying the Enclosed Mall, parking lots and common areas currently constructed; and (ii) preventing White Flint from constructing the buildings in its Sketch Plan while the parties' REA was in effect. J.A. 16-20, 9-15.  Maryland state and federal courts have routinely awarded this type of preventative injunctive relief for violations of private covenants.  *See, e.g., Redner's*, 2013WL 2903285 at *6; *Chestnut*, 148 Md. App. 199-202; *Colandrea*, 351 Md. 371; *Kirkley v. Seipelt,* 212 Md. 127, 128 A.2d 430 (1957); *Mikolasko v. Schovee,* 124 Md. App. 66, 88, 720 A.2d 1214, 1224 (1998), *aff'd,* 356 Md. 93, 737 A.2d 578 (1999); *Souza v. Columbia Park and Recreation Association, Inc.,* 70 Md. App. 655, 657, 522 A.2d 1376, 1377–78, *cert. denied,* 310 Md. 130, 527 A.2d 51 (1987).

In an effort to avoid an injunction from issuing "as a matter of course" as required under *Redner's* and *Chestnut,* White Flint deceivingly argued that it would be too judicially onerous for the court to issue an injunction against it

because it would require the court to allegedly supervise the: (i) rebuilding of the Bloomingdale's store; and (ii) reletting of the mall.  J.A. 717-725.  The district court accepted this argument.   In granting White Flint's Motion precluding injunctive relief, the district court stated that it believed it would be too problematic to issue an injunction that requires "a rebuilding [of the Bloomingdale's store] or bringing tenants back in" the Mall.  J.A. 799-800.

Granting White Flint's Motion on the basis, however, was reversible error for two reasons.  First, Lord & Taylor never asked that the court require White Flint to "rebuild" the Bloomingdale's store or to "relet" the Mall, and indeed specifically stated it was *not* seeking this relief.  J.A. 738-744.  Consequently, it was error to preclude an injunction on this basis.  Second, a negative injunction which simply enforces the parties bargain and prevents White Flint from intentionally violating the covenants is entirely feasible and requires no judicial oversight.

A. **Lord & Taylor Did Not Ask The Court to Order White Flint to Rebuild Bloomingdale's or to Relet the Mall.**

When Lord & Taylor filed this suit, it was evident that White Flint intended take steps to construct its Sketch Plan.  White Flint had systematically begun to rid

47

the mall of its tenants and decided to knock down Bloomingdale's store in order to make way for future development.[4]  J.A. 667-673; 639-647.

Lord & Taylor has very limited rights under the REA to complain about changes made to the Bloomingdale's Store.  Section 6.1(b) of the REA restricts White Flint from unilaterally altering, modifying or changing the "Partnership Tract" in the ways described therein.  J.A. 76-77.  The term "Partnership Tract" is defined as the area depicted in the plot plan except for the Lord & Taylor Tract and the Bloomingdale's Tract.  J.A. 111.  The Bloomingdale's Store is located on the Bloomingdale's Tract.

When White Flint knocked down the Bloomingdale's store rather than reletting it and informed Lord & Taylor that it intended to move forward with construction of its Sketch Plan over Lord & Taylor's objections, Lord & Taylor came to the district court with one purpose—to stop White Flint from violating the restrictive covenants.  Injunctive relief is relief "prohibiting someone from doing some specified act or commanding someone to undo some wrong or injury ... [g]enerally, it is a preventive and protective remedy, aimed at future acts, and it is not intended to redress past wrongs." *Carroll County Ethics Comm'n v. Lennon,*

---

[4] Lord & Taylor asked in discovery for details and communications concerning White Flint and Bloomingdale's so it could determine how Bloomingdale's lease rights were terminated, or if they were terminated at all, but White Flint has refused to provide any discovery on this topic.

48

119 Md. App. 49, 58, 703 A.2d 1338, 1342–43 (1998). That is the relief Lord & Taylor sought. Count II specifically sought a permanent injunction aimed at stopping White Flint's violations by: (i) preventing the destruction of the mall, its parking lots and common areas; (ii) preventing the construction of the Sketch Plan; and (iii) preventing the premature vacating of any more tenants from the Enclosed Mall. J.A. 20.

At oral argument on White Flint's Motion, Lord & Taylor repeatedly informed the district court that all it was asking the district court to do was enjoin White Flint from demolishing the current Site and constructing its Sketch Plan; it was not asking the district court for any other relief:

- "We are not asking for the Court to start hiring, overseeing their hiring of employees, hiring the landscapers, deciding whether a pretzel shop or some other clothing store starts going back in the mall". J.A. 738, lines 14-17.

- "We do not ask the Court to go in and start making them relet this mall and fill it up with tenants. What we have said is: You can't tear down the mall. You can't tear down the parking garage." J.A. 739, lines 5-9.

- "We have not said "restore" [the Bloomingdale's Site or prior tenants]. What's in our complaint is in paragraph 43 and 44 where we say, your Honor, we are asking you to tell them, "no they cannot do this", they cannot construct the sketch plan that violates the restrictive covenants." J.A. 739, lines 12-18.

- "We are not asking for that [to put Bloomingdale's back up], and we can't ask them to put Bloomies up." J.A. 744 lines 4-5.

49

- "[A]ll we are asking for…is injunctive relief to stop them from knocking down the mall.  If they can't knock down the mall, they might think twice about ridding it of its tenants, as they have done…[White Flint] might just start refilling the mall itself so they can make money".  J.A. 761, lines 15-21.

Further, when the district court asked Lord & Taylor numerous times what should be in the Order enjoining White Flint, Lord & Taylor responded:

- "You [White Flint] are enjoined from constructing the sketch plan to the extent that it violates the restrictive covenants set forth in the REA agreement. That's what we want, your Honor.  That's expressly stated in our Complaint. You are enjoined from doing anything/constructing anything that's inconsistent with your agreement.  J.A. 742, lines 10-17.

- "What your order would read tomorrow, it would say, You, White Flint, cannot construct anything in the sketch plan which violates the restrictive covenants that are already recorded and are in the land records.  Specifically, you cannot knock down the parking garages, the common areas.  You cannot knock down the enclosed mall…you could track Section 6.1(b), you cannot change, alter the outside, enclosed mall, the location, size of the buildings, or add any additional density.  It's all there in 6.1(b).  That's what the Court's order would be.  And the Court is not doing anything novel other than enforcing the terms of the parties bargain that they made…I am asking the Court: Enforce the parties' bargain.  That's it." J.A. 745, lines 1-15.

- "That's why I come back to the Court's question [which was], 'are you really asking me, Ms. Gambino, for a mandatory injunction where I [have] to oversee mall development?'  The answer is, No.  What I am really asking the Court to do is just enforce the parties' bargain, which is, you can't construct something other than what's in that agreement and what we agreed to." J.A. 750, lines 5-11.

Consequently, because Lord & Taylor never asked the Court to require White Flint to rebuild the Bloomingdale's store or to relet the Mall, it was error for

the Court to find that an injunction would not be feasible because it would require the Court to allegedly oversee the rebuilding of the Bloomingdale's store and the reletting of the Mall.  J.A. 800.  Such a finding misapprehended the relief sought by Lord & Taylor, and ignores Maryland precedent that routinely grants negative injunctions to stop covenants from being violated.

### B.     Granting the Relief Sought By Lord & Taylor Requires No Judicial Oversight.

The injunctive relief sought by Lord & Taylor was entirely feasible and required no judicial oversight whatsoever.  All that was required by the district court was to enforce the parties bargain by enjoining White Flint from demolishing the enclosed mall, parking lots, and common areas in accordance with Section 6.1(b), and thereby preclude White Flint from constructing its proposed sketch plan while the REA is in effect.  There is nothing novel about the relief sought by Lord & Taylor.  To the contrary, this type of injunctive relief is routinely given in order to enforce a restrictive covenant.  *See, e.g., Redner's*, 2013 WL 2903285 at *7 (requiring landlord to stop leasing to competitors of Redner's which was prohibited by the lease and affirmatively requiring removal of tenants in violation of restrictive covenants); *City of Bowie*, 398 Md. at 657 (enjoining a dance studio from operating in a building subject an office-use restriction); *Chestnut*, 811 A.2d at 403 (enjoining neighbor from violating restrictive covenants that prohibit the construction of sheds on property within the subdivision and requiring the removal

51

of the shed constructed); *Eisenstadt*, 252 Md. at 361, 250 A.2d at 87 (enjoining landowner from violating deed restriction which prevented a lengthy waterline from being constructing and further requiring the removal of the water line).

The Enclosed Mall, parking lots and common area are *still in existence* and have not been demolished and tenants are still operating at the Center.[5] Thus, it is entirely within the power of the district court to stop the destruction of the improvements and preclude the construction of the Sketch Plan by simply enforcing the plain terms set forth in Sections 6.1(b) and 8.1 of the REA. Thus, it was error to find a prohibitive injunction was not feasible, and to rely on this as a basis for granting White Flint's Motion.

## V.    THE DISTRICT COURT COMMITTED REVERSIBLE ERROR BY PREMATURELY GRANTING WHITE FLINT'S MOTION WITHOUT ALLOWING LORD & TAYLOR TO CONDUCT DISCOVERY

This Court has held that it is error to grant summary judgment in favor of a movant when the nonmovant has requested discovery, has not been permitted the discovery and has preserved its objection under Rule 56(d). 519 Fed. Appx. 176 (4th Cir. 2013). In *Works v. Colvin*, this Court stated:

> Rule 56(d) "require[s] that 'summary judgment be refused where the nonmoving party has not had the opportunity to discover information that is essential to his opposition.' " *Nguyen v. CNA Corp.,* 44 F.3d 234, 242 (4th Cir.1995) (quoting *Anderson v. Liberty Lobby, Inc.,* 477

---

[5] Only the Bloomingdale's Tract has been altered.

U.S. 242, 250 n. 5, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986)); *see also Evans v. Techs. Applications & Serv. Co.,* 80 F.3d 954, 961 (4th Cir.1996) (Generally, "summary judgment is appropriate only after adequate time for discovery." (internal quotation marks omitted)). The rule "is intended as a safeguard against a premature grant of summary judgment ... thus, [courts] should construe the rule liberally[.]" *King v. Cooke,* 26 F.3d 720, 726 (7th Cir.1994); *see also Harrods Ltd. v. Sixty Internet Domain Names,* 302 F.3d 214, 245 n. 18 (4th Cir.2002) (discussing with approval sources in favor of applying the rule liberally).

Like the plaintiff in *Works,* Lord & Taylor took reasonable steps to conduct discovery to gather additional evidence to oppose White Flint's Motion, and in particular to challenge the affidavits offered by White Flint in support of its motion. Specifically, Lord & Taylor diligently attempted to take depositions and requested documents at the outset of this case. See J.A. 472-478. The district court, however, stayed discovery briefly so that the parties could mediate. J.A. 4 (Dkt. 23). After mediation was not successful, and discovery thus resumed, Lord & Taylor tried three times to get dates from White Flint for depositions of White Flint's affiants. J.A. 5-6 (Dkt. 32, 39, 39-1). White Flint refused to respond to those requests. *Id.* When Lord & Taylor noticed the depositions so that it could get the testimony it needed to rebut White Flint's assertions, particularly with respect to the purported equities, White Flint moved for a Protective Order prohibiting the depositions, even going so far as claim that the depositions of the affiants upon which they relied in support of their Motion were "not relevant." J.A. 468-471. Less than twenty four hours after White Flint filed its frivolous

Motion, before Lord & Taylor had the opportunity to respond and point out the very misleading nature of White Flint's Motion, the district court granted the Motion for Protective Order. J.A. 479. The district court thereby precluded Lord & Taylor from obtaining needed discovery before filing its Opposition, despite Lord & Taylor's diligent efforts to do so.

Lord & Taylor properly preserved its claim that it was entitled to the discovery under Fed. R. Civ. P. 56(d). Lord & Taylor provided an affidavit from counsel showing the diligent steps taken to perform discovery and the facts and issues that needed to be explored before a more adequate response to White Flint's Motion could be undertaken. J.A. 481-485 (Dkt. 39). It set forth in its opposition all of the facts it needed discovery to support that would further rebut White Flint's, assertions, particularly its claimed equities. *Id.*

The district court, however, seemingly ignored Lord & Taylor's request under Rule 56(d). It committed reversible error in doing so. *See Works,* 519 Fed. Appx. 176 (4th Cir. 2013); *Nader v. Blair*, 549 F.3d 953, 961 (4th Cir. 2008); *Harrods Ltd. v. Sixty Internet Domain Names*, 302 F.3d 214, 244 (4th Cir. 2002).

## <u>CONCLUSION</u>

For the reasons stated herein and for those set forth in the record, the Court's December 20, 2013 Order granting White Flint's Motion for Summary Judgment

should be reversed, and this case should be remanded with instructions for further

proceedings on Count II of Lord & Taylor's Complaint.

Respectfully submitted,

/s/ *Michelle D. Gambino*
Michelle D. Gambino
David G. Barger
Kevin B. Bedell
GREENBERG TRAURIG LLP
1750 Tysons Blvd., Suite 1200
McLean, VA  22102
(703) 749-1300

## **STATEMENT IN SUPPORT OF ORAL ARGUMENT**

Lord & Taylor believes that oral argument will assist the Court in resolving the issues presented in this case and requests that oral argument be expeditiously scheduled.

# UNITED STATES COURT OF APPEALS FOR THE FOURTH CIRCUIT

No. 13-2548          **Caption:** Lord & Taylor v. White Flint

## CERTIFICATE OF COMPLIANCE WITH RULE 28.1(e) or 32(a)
Type-Volume Limitation, Typeface Requirements, and Type Style Requirements

1. **Type-Volume Limitation:** Appellant's Opening Brief, Appellee's Response Brief, and Appellant's Response/Reply Brief may not exceed 14,000 words or 1,300 lines. Appellee's Opening/Response Brief may not exceed 16,500 words or 1,500 lines. Any Reply or Amicus Brief may not exceed 7,000 words or 650 lines. Counsel may rely on the word or line count of the word processing program used to prepare the document. The word-processing program must be set to include footnotes in the count. Line count is used only with monospaced type.

   This brief complies with the type-volume limitation of Fed. R. App. P. 28.1(e)(2) or 32(a)(7)(B) because:

   ☐   this brief contains _____13,583_____ [*state number of*] words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii), *or*

   ☐   this brief uses a monospaced typeface and contains _____ [*state number of*] lines of text, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).

2. **Typeface and Type Style Requirements:** A proportionally spaced typeface (such as Times New Roman) must include serifs and must be 14-point or larger. A monospaced typeface (such as Courier New) must be 12-point or larger (at least 10½ characters per inch).

   This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because:

   ☑   this brief has been prepared in a proportionally spaced typeface using
   MS Word 2010 _____ [*identify word processing program*] in
   Times New Roman, 14 point _____ [*identify font size and type style*]; **or**

   ☐   this brief has been prepared in a monospaced typeface using
   _____ [*identify word processing program*] in
   _____ [*identify font size and type style*].

(s) David G. Barger _____

Attorney for appellant _____

Dated: 2/10/14 _____

# CERTIFICATE OF SERVICE

I certify that on <u>February 10, 2014</u> the foregoing document was served on all parties or their counsel of record through the CM/ECF system if they are registered users or, if they are not, by serving a true and correct copy at the addresses listed below:

Stuart Scott Morrison, Esq.
David C. Rohrbach, Esq.
KATTEN, MUCHIN & ROSENMAN, LLP
Suite 200
2900 K Street NW
Washington, DC 20007-5118
202-625-3500
202-625-3550
scott.morrison@kattenlaw.com
david.rohrbach@kattenlaw.com

David G. Barger
_____
Signature

2/10/2014
_____
Date