No. 13-2548
———————————————————

# United States Court of Appeals
# for the Fourth Circuit

———————————————————

## LORD & TAYLOR, LLC,

*Appellant,*

– v. –

## WHITE FLINT, LP, n/k/a WHITE FLINT MALL, LLLP,

*Appellee.*

———————————————————

**On Appeal from the United States
District Court for the District of Maryland**

———————————————————

**BRIEF OF APPELLEE**

———————————————————

S. SCOTT MORRISON
KATTEN MUCHIN ROSENMAN LLP
2900 K Street, NW
North Tower – Suite 200
Washington, DC  20007-5118
Tel:  202-625-3500

*Counsel for Appellee*

## DISCLOSURE OF CORPORATE AFFILIATIONS AND OTHER INTERESTS

Pursuant to FRAP 26.1 and Local Rule 26.1, **White Flint, L.P., n/k/a White Flint Mall, LLLP,** who is **Appellee**, makes the following disclosure:

1.    Is party/amicus a publicly held corporation or other publicly held entity?

        **YES**        ✓**NO**

2.    Does party/amicus have any parent corporations?

        **YES**        ✓**NO**

3.    Is 10% or more of the stock of a party/amicus owned by a publicly held corporation or other publicly held entity?

        **YES**        ✓**NO**

4.    Is there any other publicly held corporation or other publicly held entity that has a direct financial interest in the outcome of the litigation (Local Rule 26.1(b))?

        **YES**        ✓**NO**

5.    Is party a trade association? (amici curiae do not complete this question)

        **YES**        ✓**NO**

6.    Does this case arise out of a bankruptcy proceeding?

        **YES**        ✓**NO**

Signature: ___/s/ S. Scott Morrison_____      Date: _March 13, 2014___

Counsel for: _Appellee_____

## <u>TABLE OF CONTENTS</u>

DISCLOSURE OF CORPORATE AFFILIATIONS
AND OTHER INTERESTS ................................................................. i

TABLE OF AUTHORITIES ............................................................ iv

COUNTERSTATEMENT OF JURISDICTION ....................................... 1

COUNTERSTATEMENT OF THE ISSUE ........................................... 1

COUNTERSTATEMENT OF THE CASE ............................................ 2

     A.    The Parties And The REA ........................................... 3

     B.    The Decline Of Enclosed Malls Like White Flint Mall .......... 4

     C.    White Flint's Plan To Redevelop The Mall Site As Part
             Of Montgomery County's Master Redevelopment Plan ......... 6

     D.    Lord & Taylor's Initial Cooperation
             With The Redevelopment ........................................... 9

     E.    The Proceedings Below .............................................. 11

SUMMARY OF THE ARGUMENT ..................................................... 16

STANDARD OF REVIEW ............................................................... 19

ARGUMENT ................................................................................ 21

I.     THE DISTRICT COURT CORRECTLY CONCLUDED
      THAT INJUNCTIVE RELIEF IS IMPRACTICABLE. ................. 21

     A.    Courts Do Not Grant Injunctions Or
             Order Specific Performance Where
             Ongoing Court Supervision Would Be Required. ................ 21

     B.    The District Court Properly Exercised Its Discretion
             To Deny Lord & Taylor's Request For An Injunction .......... 25

II.   THE DISTRICT COURT APPLIED
      THE PROPER LEGAL STANDARD. .......................................... 29

      A.   The District Court's Decision
           Is Consistent With *Redner's*. .................................... 30

      B.   The District Court's Decision Was Based On The
           Impracticability of Injunctive Relief In This Case. ............. 36

III.  LORD & TAYLOR HAS AN ADEQUATE REMEDY AT LAW. ... 40

      A.   Lord & Taylor Will Benefit From The Redevelopment. ....... 40

      B.   Any Injury To Lord & Taylor
           Is Compensable With Money. .................................... 41

      C.   Lord & Taylor's Damages,
           If Any, Are Readily Calculable. ................................ 44

      D.   There Is No Threat To Lord &
           Taylor's Existence As A Business. ............................. 47

      E.   Any Harm To Lord & Taylor's Goodwill
           Does Not Provide A Basis For Injunctive Relief. ................. 48

CONCLUSION ....................................................................... 49

STATEMENT REGARDING ORAL ARGUMENT

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

**CASES**

*3M Co. v. Avery Dennison Corp.*,
  No. 10-2630, 2010 WL 5288168 (D. Minn. Dec. 21, 2010) ................ 42

*8600 Assocs., Ltd. v. Wearguard Corp.*,
  737 F. Supp. 44 (E.D. Mich. 1990) ..................................................... 24

*Ammendale Normal Inst., Inc. v. Schrom Constr., Inc.*,
  288 A.2d 140 (Md. 1972) ................................................................. 21-22

*Amtote Int'l, Inc. v. PNGI Charles Town Gaming Ltd. Liab. Co.*,
  998 F. Supp. 674 (N.D.W. Va. 1998) .............................................. 47-48

*Bethesda Softworks, LLC v. Interplay Entm't Corp.*,
  452 Fed. Appx. 351 (4th Cir. 2011) ................................................... 41

*Capital Tool & Mfg. Co., Inc. v. Maschinenfabrik Herkules*,
  837 F.2d 171 (4th Cir. 1988) .............................................................. 21

*CBL & Assocs., Inc. v. McCrory Corp.*,
  761 F. Supp. 807 (M.D. Ga. 1991) ..................................................... 24

*Chestnut Real Estate P'ship v. Huber*,
  811 A.2d 389 (Md. Ct. Spec. App. 2002) ...................................... 31, 33

*City of Bowie v. MIE Props., Inc.*,
  922 A.2d 509 (Md. 2007) .................................................................... 34

*Coffman v. James*,
  177 So. 2d 25 (Fla. Dist. Ct. App. 1965) ........................................... 33

*Colandrea v. Wilde Lake Cmty. Assoc., Inc.*,
  761 A.2d 899 (Md. 2000) .................................................................... 34

*CR-RSC Tower I, LLC v. RSC Tower I, LLC*,
  32 A.3d 456 (Md. Ct. Spec. App. 2012) ......................................... 45-46

*Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*,
  108 F. Supp. 2d 859 (S.D. Ohio 2000) ............................................... 42

iv

*Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*,
   73 A.3d 224 (Md. 2013) .................................................................. 35, 37

*Eastside Vend Distributors, Inc. v. Pepsi Bottling Group, Inc.*,
   913 A.2d 50 (Md. 2006) ...................................................................... 21

*eBay Inc. v. MercExchange, LLC*,
   547 U.S. 388 (2006) ........................................................................... 30

*Edison Realty Co. v. Bauernschub*,
   62 A.2d 354 (Md. 1948) ...................................................................... 23

*Eisenstadt v. Barron*,
   250 A.2d 85 (Md. 1969) ...................................................................... 34

*Gebhardt European Autos, LLC v. Porsche Cars of N. Am., Inc.*,
   No. 10-cv-02696-MSK-KMT, 2010 WL 6575913 (D. Colo.
   Dec. 20, 2010) ................................................................................. 42-43

*Gross v. J & L Camping & Sports Ctr., Inc.*,
   312 A.2d 270 (Md. 1973) .................................................................... 32

*Grubb v. Guilford*,
   178 A.2d 886 (Md. 1962) .................................................................... 35

*Hupp v. George R. Rembold Bldg. Co.*,
   369 A.2d 1048 (Md. 1977) .................................................................. 32

*Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*,
   389 A.2d 887 (Md. 1978) ................................................................. 44-45

*Kemp v. Kemp*,
   411 A.2d 1028 (Md. 1980) .................................................................. 22

*Kirkley v. Seipelt*,
   128 A.2d 430 (Md. 1957) .................................................................... 35

*M. Leo Storch Ltd. P'ship v. Erol's, Inc.*,
   620 A.2d 408 (Md. Ct. Spec. App. 1993) ................................... 17, 23-25

*Marble Co. v. Ripley*,
   77 U.S. 339 (1870) ............................................................................. 22

*Md.-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena,*
    386 A.2d 1216 (Md. 1978) ................................................................ 31

*Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or.,*
    254 F.3d 846 (9th Cir. 2001) ........................................................... 20

*Mike's Train House, Inc. v. Broadway Ltd. Imports, LLC,*
    708 F. Supp. 2d 527 (D. Md. 2010) ........................................... 41-42

*Mikolasko v. Schovee,*
    720 A.2d 1214 (Md. Ct. Spec. App. 1998) .................................... 35

*Optivision, Inc. v. Syracuse Shopping Ctr. Assocs.,*
    472 F. Supp. 665 (N.D.N.Y. 1979) ........................................... 43, 47

*Person v. Mayor of Baltimore,*
    437 F. Supp. 2d 476 (D. Md. 2006) .......................................... 41, 49

*Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship,*
    No. RDB-11-1864, 2013 WL 2903285 (D. Md. June 13, 2013)... *passim*

*Schutt Mfg. Co. v. Riddell, Inc.,*
    673 F.2d 202 (7th Cir. 1982) ........................................................... 20

*Scotts Co. v. United Indus. Corp.,*
    315 F.3d 264 (4th Cir. 2002) ........................................................... 49

*Sergeant Co. v. Clifton Bldg. Corp.,*
    423 A.2d 257 (Md. Ct. Spec. App. 1980) ....................................... 45

*Signature Flight Support Corp. v. Landow Aviation Ltd. P'ship,*
    442 F. App'x 776 (4th Cir. 2011) ............................................... 19-20

*Souza v. Columbia Park & Recreation Ass'n, Inc.,*
    522 A.2d 1376 (Md. Ct. Spec. App. 1987) .................................... 35

*Strauss v. Peninsula Reg'l Med. Ctr.,*
    No. 95-2424, 1996 WL 265928 (4th Cir. May 20, 1996) .................... 42

*Torres Advanced Enter. Solutions, LLC v. Mid-Atl. Prof'ls Inc.,*
    No. PWG-12-3679, 2013 WL 531215 (D. Md. Feb. 8, 2013) .............. 49

vi

*Trimed, Inc. v. Sherwood Med. Co.,*
    772 F. Supp. 879 (D. Md. 1991) ........................................... 46

*United States v. Delfino,*
    510 F.3d 468 (4th Cir. 2007), *cert. denied*, 555 U.S. 812 (2008) ........ 21

*United States v. Paramount Pictures, Inc.,*
    334 U.S. 131 (1948) ..................................................... 22-23

*Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.,*
    984 F.2d 113 (4th Cir. 1993) ............................................. 19

*William F. Wilke, Inc. v. Dep't of Army,*
    485 F.2d 180 (4th Cir. 1973) ............................................. 22

*Woollard v. Gallagher,*
    712 F.3d 865 (4th Cir. 2013) ............................................. 20

*Yaffe v. Scarlett Place Residential Condo., Inc.,*
    45 A.3d 844 (Md. Ct. Spec. App. 2012) ................................... 31-32

## FEDERAL STATUTES

28 U.S.C. § 1292(a)(1) ......................................................... 1

28 U.S.C. § 1332 ............................................................... 1

28 U.S.C. §§ 2201 and 2202 .................................................... 39

## STATE STATUTES

Md. Code, Cts. & Jud. Proc. § 3-601 ........................................... 31

## TREATISES

Restatement (Second) of Contracts § 366 (1981) ................................ 23

**NON-PERIODICAL PUBLICATIONS**

John Norton Pomeroy, *A Treatise on the Specific Performance of Contracts*, § 312 .................................................................. 23

## COUNTERSTATEMENT OF JURISDICTION

Appellee White Flint, LP, n/k/a White Flint Mall, LLLP ("White Flint")[1] does not dispute that the District Court had jurisdiction over this case under 28 U.S.C. § 1332 or that this Court has jurisdiction to consider this appeal under 28 U.S.C. § 1292(a)(1).  However, White Flint disputes Lord & Taylor's contention that its "property rights" are "worth billions."  It is the planned redevelopment of the White Flint Mall as part of Montgomery County's master plan that White Flint believes will generate billions of dollars in value over the next 20 years, whether or not Lord & Taylor is even a tenant in the redevelopment.

## COUNTERSTATEMENT OF THE ISSUE

Lord & Taylor's Statement of the Issues Presented fails to identify the actual issue before this Court.  The District Court granted White Flint summary judgment on Count II of Lord & Taylor's Complaint because granting a permanent injunction (1) was not a feasible remedy given Lord & Taylor's years-long delay in seeking injunctive relief, and (2) would have embroiled the District Court in prolonged oversight of the reconstruction, re-tenanting, and daily operation of an enclosed mall

---

[1] The official caption of this appeal inaccurately lists Appellee as White Flint, LP, f/k/a White Flint Mall, LLP.

that is no longer economically viable.  There is no dispute that the mall is 75 percent vacant.  There is no dispute that one of the mall's anchor stores, which occupied one third of the total square footage of the mall, has been demolished – with the full knowledge of Lord & Taylor.  And there is no dispute that the parties' Construction Operation and Reciprocal Easement Agreement (the "REA") requires White Flint to operate a first-class mall at the site.  Thus, the issue presented in this appeal is simply:

> Did the District Court abuse its discretion in denying Lord & Taylor's request to enjoin the planned redevelopment of the White Flint Mall, where the mall is already 75 percent vacant, a third of it has been demolished, and an injunction would require the District Court to oversee the re-tenanting, reconstruction, and operation of the mall?

## COUNTERSTATEMENT OF THE CASE

On December 20, 2013, the District Court granted White Flint's motion for summary judgment on Count II of Lord & Taylor's Complaint, which sought preliminary and permanent injunctive relief blocking White Flint's redevelopment of the mall and directing White Flint to operate a first-class shopping center on the site.  The District Court concluded that injunctive relief was not a feasible remedy because an injunction would require it to oversee the reconstruction, re-

2

tenanting, and daily operation of the mall, tasks for which a court is particularly ill-suited. This case presents the narrow question of whether the District Court abused its discretion in reaching that conclusion.

## A. The Parties And The REA

White Flint is the owner of the White Flint Mall, a regional shopping center located along Rockville Pike in Montgomery County, Maryland. Joint Appendix ("JA") 201-72. Lord & Taylor is an anchor tenant in the mall. *Id.*

In 1975, White Flint, Lord & Taylor (through its predecessor in interest), and Bloomingdale's (through its predecessor in interest) executed an agreement, the REA, for the construction and operation of the mall. JA 274-364. The REA called for White Flint to construct and operate the mall and for Lord & Taylor and Bloomingdale's to construct and operate retail department stores in the mall pursuant to subleases with White Flint. *Id.* The REA requires White Flint to operate a first-class high fashion shopping center at the mall site. JA 274, 332-33.

Lord & Taylor signed a sublease with White Flint the same day the REA was executed. JA 201-72. The sublease provided for an initial

term of 35 years and granted Lord & Taylor three 15-year renewal options.  JA 202-03.  In 2006, Lord & Taylor exercised its first and second renewal options, extending the sublease expiration date through February 2042.  JA 366.[2]

### B.    The Decline Of Enclosed Malls Like White Flint Mall

The mall opened in 1977.  Like other malls of the time, it included multiple levels of enclosed first-class retail shops and restaurants flanked by anchor tenants, and it was surrounded by large surface and structured parking lots.  JA 369; JA 375-76.

The retail economy has changed considerably in many parts of the country, including the Maryland suburbs, since the mid-1970s.  Interest in, and the economic viability of, enclosed malls like White Flint Mall have declined significantly, as evidenced by the annual revenue decreases experienced by Lord & Taylor and numerous other stores in the mall over the past 15 years.  Open-air developments that include a mix of retail, residential, office, and entertainment uses have surged in popularity and financial viability.  JA 376; JA 368-69.  Construction of "streetfront" or "town center" developments has accelerated, while

---

[2] Lord & Taylor's extension letter incorrectly recites the sublease's new expiration date as January 31, 2043.

construction of enclosed malls has slowed dramatically. JA 376; JA 369. Indeed, as shopping habits have shifted and the economics of mall operations have changed in recent years, many enclosed malls across the country have closed. JA 376; JA 369.

White Flint Mall has not escaped these trends. Despite White Flint's best efforts to maintain the mall as a first-class shopping destination, current patterns in retail shopping have severely eroded the mall's customer base. JA 368-69. Bloomingdale's, the mall's largest tenant since the mall opened in 1977, chose, in the face of declining sales, not to renew its lease when its term expired in March 2012. Its store has since been demolished – without objection by Lord & Taylor. While Lord & Taylor contends that Bloomingdale's was not technically part of the mall, that is a distinction without a difference. Bloomingdale's was the largest anchor store at the site and was physically attached to the mall. Lord & Taylor's annual sales have fallen significantly over the past 15 years. JA 369. Indeed, Lord & Taylor predicts that the redevelopment of the White Flint Mall will almost double its annual gross sales – from $23.5 million to $40 million or more. JA 714-15.

### C. White Flint's Plan To Redevelop The Mall Site As Part Of Montgomery County's Master Redevelopment Plan

Under these circumstances, White Flint determined that, in order to maintain an economically viable first-class shopping center on the site, it was imperative to redevelop and revitalize the mall as an open-air, mixed-use facility. JA 368-69; JA 377. White Flint joined with local public officials and community leaders to develop a plan for revitalizing the mall. This effort was part of Montgomery County's broader master plan, known as the White Flint Sector Plan (the "Sector Plan"), to redevelop the 430-acre area around the White Flint Metro station into a mixed-use, urban town center. JA 371; JA 384. The Montgomery County Council unanimously approved the Sector Plan in March 2010 as part of the County's effort to replace suburban sprawl with planned growth around transportation hubs. JA 384.

The Sector Plan is a partnership between Montgomery County and private developers. When it is completed, the redevelopment will include approximately 14,000 new residential units, 7.5 million square feet of new commercial and retail space, and $1 billion of new public infrastructure, including schools, fire stations, and recreation centers. The redevelopment is projected to generate approximately 39,000 new

6

jobs and $7 billion in additional tax revenue for Montgomery County over the next 40 years.  JA 384.  Notably, Lord & Taylor never objected to the Sector Plan.

Maryland recently recognized the Sector Plan for its contributions to "smart growth" efforts across the state.  In February 2013, the Maryland Sustainable Growth Commission awarded Montgomery County a Sustainable Growth Award.  The Commission's press release stated:

> The White Flint Sector Plan set the stage for transforming a car-centric suburban shopping district known for its sea of parking lots and choking traffic into a dynamic mixed-use center featuring housing, shopping, public use space, and a favorable environment for walking and cycling.

JA 710.

The White Flint Mall site is the largest property within the Sector Plan area. JA 373.  In November 2011, White Flint held a public meeting at the mall to unveil a preliminary plan to redevelop the mall site.  This meeting followed numerous meetings and discussions over the preceding year with interested members of the community about the redevelopment.  JA 370.  The purpose of the November 16 meeting was to introduce and explain the redevelopment plan and solicit

feedback from the community prior to the submission of a sketch plan to Montgomery County. White Flint provided notice of the meeting by posting signs at various locations around the mall site. JA 391-94. The audience overwhelmingly supported the plan. JA 370.

Three months later, in February 2012, White Flint filed an application for approval of the sketch plan with Montgomery County. JA 371; JA 396-436. As depicted on the sketch plan, White Flint's redevelopment plan calls for the transformation of the mall site into a mixed-use town center that will include approximately 5.2 million square feet of retail shops, offices, restaurants, apartments, condominium units, and public and private open space spread over 45 acres and centered around an open-air plaza. The redevelopment will be served by a new network of public and private streets that will connect it to Rockville Pike and accommodate pedestrians, bicycles, and cars. JA 396-436; JA 370. The plan incorporates Lord & Taylor's existing store, which will be surrounded by a mix of residential and retail development. JA 399, 403; JA 371.

On October 25, 2012, the Montgomery County Planning Board held a public hearing on White Flint's sketch plan application. After

8

the meeting, the Planning Board voted unanimously to approve the sketch plan, stating that it "[f]urthers the recommendations and objectives of the … Sector Plan." JA 449. The Planning Board also stated that the planned redevelopment of the mall "is an essential component of the Sector Plan." JA 385. Notably, Lord & Taylor never objected to White Flint's sketch plan application.

### D.    Lord & Taylor's Initial Cooperation With The Redevelopment

Lord & Taylor has known about the Sector Plan and, therefore, the plan to redevelop the mall site since, at the very latest, March 2010, when it was approved by the Planning Board. JA 442-60. Montgomery County began holding public hearings on the Sector Plan well before that, in early 2009.

As noted above, Lord & Taylor never objected to the Sector Plan in hearings before either the Montgomery County Planning Board or the Montgomery County Council. Nor did Lord & Taylor raise any public objections to the mall redevelopment itself before the County approved the sketch plan – *e.g.*, it raised no objections at the November 2011 pre-submission meeting, the October 25, 2012, hearing before the Planning Board, or otherwise in communications with representatives

9

of Montgomery County. JA 371. Lord & Taylor also did not object or otherwise express any concerns to White Flint when White Flint demolished the Bloomingdale's store in late 2012 and early 2013. *Id.*

To the contrary, in 2012 and during the first half of 2013, Lord & Taylor actively participated in discussions with White Flint about the location and operation of the Lord & Taylor store during and after construction of the redevelopment. As part of those discussions, White Flint hired, on Lord & Taylor's recommendation, Lord & Taylor's retail development consultant, Street-Works Development, LLC ("Street-Works"), to assist with determining how Lord & Taylor would best fit in the redevelopment. JA 370. After reviewing plans for the proposed redevelopment, Street-Works told White Flint that Lord & Taylor would be "crazy" not to be a part of the redevelopment. JA 715. And, in late 2012, the President of Real Estate for the Hudson's Bay Company, which oversees Lord & Taylor's real estate assets, told White Flint that Lord & Taylor expects its annual gross sales to rise to $40 million or more when the project is completed. JA 714-15. Lord & Taylor's sales in 2013 were approximately $23.5 million. *Id.*

### E.    The Proceedings Below

In May 2013, Lord & Taylor abruptly ended discussions with White Flint.  Its lawyers sent a letter to White Flint stating that the planned redevelopment violated the REA and the sublease and demanding that White Flint halt its redevelopment efforts.  JA 462-64.

In July 2013, Lord & Taylor filed the Complaint, seeking (i) a declaration that White Flint's planned redevelopment violates the terms of the REA (Count I), and (ii) an order enjoining White Flint from undertaking the redevelopment until Lord & Taylor's sublease rights expire, which will be in 2042 or, if Lord & Taylor exercises its third renewal option, 2057 (Count II).  In Count II, Lord & Taylor requested both a *preliminary* and a permanent injunction to block the redevelopment.  JA 16-20.

Lord & Taylor failed to inform the Court in its appeal brief that it sought a preliminary injunction as well as a permanent injunction in Count II.  *See* Appellant's Brief, at 11 (stating that Lord & Taylor sought in Count II "specific performance and enforcement of the restrictive covenants *through a permanent injunction* …") (emphasis added).  Such candor would have undermined Lord & Taylor's preferred

narrative in this appeal, which is that White Flint somehow misled the District Court into applying the wrong legal standard. *See id.*, at 18 n.3 (alleging that "White Flint erroneously relied upon the Federal preliminary injunction standard despite the fact that Lord & Taylor was seeking only a permanent injunction"). In fact, the District Court applied Maryland substantive law, as required.

Although it alleged that it would be irreparably harmed, Lord & Taylor never filed a motion for a preliminary injunction before the District Court – despite its request for preliminary injunctive relief in Count II.

Lord & Taylor also requested in Count II an order "requir[ing] Landlord to abide by its obligations under the [REA] to operate a first class high fashion retail Shopping Center at the Site." JA 18; *see also* JA 19 ("[B]y issuing the injunction, the Court will be maintaining the status quo and ensuring that [White Flint] will continue to honor its contractual obligations to operate a first class retail Shopping Center, ***with a vibrant and tenant occupied Enclosed Mall, while the [REA] is in effect***") (emphasis added).

White Flint answered the Complaint and, in September 2013, moved for summary judgment on Count II. JA 198-99. White Flint argued that Lord & Taylor was not entitled to a preliminary injunction because it could not show irreparable harm or any of the other requirements for a preliminary injunction. *See* Defendant's Motion for Summary Judgment on Count II of Plaintiff's Complaint (ECF No. 15) and Reply in support thereof (ECF No. 52). In addition, White Flint argued that a permanent injunction or order of specific performance was not a feasible remedy under Maryland law because, by the time Lord & Taylor sued, the mall indisputably was already 75 percent vacant and a third demolished. *Id*. To afford Lord & Taylor the relief it sought, including an order directing White Flint to operate a first-class enclosed mall, the District Court would have had to order White Flint not just to halt the redevelopment, but also to re-tenant and reconstruct the mall and, in effect, "referee" the day-to-day issues and disputes that inevitably would arise from such an effort. *Id*.

Lord & Taylor abandoned its claim for a preliminary injunction in its opposition brief, *see* ECF No. 44, at 37, and at the oral argument on White Flint's motion. JA 719, 731. At the hearing on December 20,

2013, the District Court granted White Flint's motion for summary judgment and entered an order dismissing Count II of the Complaint. JA 796-801; JA 808-09.  The District Court concluded that an injunction is not a feasible remedy at this stage because it would require the court either to order White Flint to maintain an untenable status quo or to oversee the reconstruction, re-tenanting, and operation of the mall.  For this reason, the District Court granted White Flint summary judgment on Count II.  The District Court stated:

> [L]et's talk about the count that seeks an injunction, permanent in nature, and affects specific performance.
>
> While I facetiously said I didn't get a hard hat in law school, the reality, though, is whether this is something that this Court has the competence to enforce by way of injunction and/or specific performance at this time under the circumstances we have here.
>
> This is not a case in which I can simply say, Get rid of that tenant or don't let that tenant come in.  There has been an enormous change at White Flint. … [T]here has been an enormous change that's gone on at White Flint in terms of physical changes, tenant changes, and the ability of this Court to grant relief would be very problematic.
>
> While Maryland law clearly favors the intent of contracting parties to enforcement of contractual terms, there is a very serious question here as to whether the Court can fashion a remedy that would, in effect, require a rebuilding or bringing tenants back in, and the Maryland

> law makes it clear that specific performance is an extraordinary remedy that should be granted only where more traditional remedies, such as damages, are either unavailable or inadequate.

JA 799-800; *see also* JA 740 ("I'm troubled by the feasibility of me telling them to restore everything that was in the sketches"); JA 801 ("[F]or me to enter into this case and try to enjoin an ongoing development project like this is just not feasible").

Lord & Taylor noticed this appeal on December 24, 2013. JA 810-12. A week later, it filed a motion in the District Court seeking to maintain the status quo pending the appeal. *See* ECF No 50. In so doing, Lord & Taylor asked for the very relief – a preliminary injunction halting the redevelopment – it had represented to the District Court just days earlier it no longer sought.

The District Court denied Lord & Taylor's motion on February 7, 2014, reiterating that an injunction was not feasible given the circumstances. The District Court stated:

> In addition [to finding that Lord & Taylor can be compensated by money damages], the Court was and remains concerned about the length of time it took Lord & Taylor to assert its rights. When there is this degree of delay, the extraordinary remedy of injunctive relief is granted only with great care and caution. The Court has already declined to grant such relief. *The project is well into*

*the advanced stages, such that it is no longer a practical option to maintain the mall in its current state.* Lord & Taylor continues to assert that "all the Court must do is state that the Shopping Center Site cannot be altered in violation of [the contract] and enjoin White Flint from constructing its mixed use development" and that they are not asking for "rebuilding or bringing tenants back to the mall." Motion for Stay, ECF No. 58, pp. 24-25. *This argument ignores the reality that the mall is almost completely vacant and partially demolished. Lord & Taylor simply waited too long to attempt to preserve a status quo that no longer exists and thus, injunctive relief is clearly no longer a feasible or realistic remedy.*

JA 814 (emphasis added).

## <u>SUMMARY OF THE ARGUMENT</u>

The District Court denied Lord & Taylor's request for a permanent injunction because an injunction would require the court to oversee the re-tenanting, reconstruction, and operation of the mall. It is undisputed that the mall is 75 percent vacant. JA 761. It is undisputed that the mall is a third demolished. JA 12-17; 814; Appellant's Brief, at 45, 52. And it is undisputed that the REA requires White Flint to operate a first-class high fashion shopping center on the mall site. JA 332-33. Therefore, an injunction necessarily would have required the District Court not just to stop the redevelopment, but also to order White Flint to find new tenants to fill the mall and to reconstruct the

Bloomingdale's space and fill it with another anchor tenant or numerous smaller tenants. Merely stopping the redevelopment – leaving the mall 75 percent vacant and partially torn down – was not a viable option, since it would guarantee that the mall would fail. Maryland courts do not grant mandatory injunctive relief where such relief would require ongoing court supervision and impose on the court a heavy burden of enforcement. *See M. Leo Storch Ltd. P'ship v. Erol's, Inc.*, 620 A.2d 408, 414 (Md. Ct. Spec. App. 1993).

Given the mall's status, no discovery was needed for the District Court to determine that an injunction or order of specific performance was unwarranted. The facts that Lord & Taylor alleged below are in dispute concern the parties' respective rights and obligations under the REA, which are relevant to Lord & Taylor's declaratory judgment claim in Count I, not the form of relief available to it under Count II.

The District Court's decision was based upon well-established Maryland law concerning injunctive relief and specific performance. It is consistent with *Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*, No. RDB-11-1864, 2013 WL 2903285 (D. Md. June 13, 2013), and the other cases Lord & Taylor cites in its brief. Contrary to Lord & Taylor's

17

claim, the District Court did not erroneously apply federal substantive law, or base its decision on a finding of a lack of irreparable harm, changed circumstances, comparative hardship, or the public interest. The District Court determined that, given the undisputed state of the mall, injunctive relief was impracticable. This conclusion was the sole predicate for the District Court's decision.

If Lord & Taylor believed the redevelopment was not in its best interests, it would have acted much earlier than July 2013. It would have moved for a temporary restraining order or preliminary injunction as soon as White Flint began to demolish the Bloomingdale's space in 2012 – or at least raised an objection to the demolition with White Flint. But Lord & Taylor did and said nothing, either when the demolition began or at any time before it was completed in early 2013. Lord & Taylor also could have sought injunctive relief immediately after the first tenant it now claims White Flint "pushed" out of the mall left the mall. Lord & Taylor, however, did not do that either.

The reason for Lord & Taylor's failure to act is that Lord & Taylor knows the redevelopment is in its financial best interests. As discussed above, Lord & Taylor and its development consultant both believe the

18

redevelopment will increase Lord & Taylor's sales significantly.  Lord & Taylor sued White Flint not to stop the redevelopment, but to leverage a payout in return for its consent to permitting the redevelopment to proceed.

Because the District Court's denial of Lord & Taylor's request for a permanent injunction was reasonable, the judgment below should be affirmed.

## STANDARD OF REVIEW

Because it misstates the issue on appeal, Lord & Taylor misstates the standard of review as well.  "[D]ecisions pertaining to injunctive relief normally are reviewed solely for abuse of discretion[.]"  *Va. Carolina Tools, Inc. v. Int'l Tool Supply, Inc.*, 984 F.2d 113, 116 (4th Cir. 1993) (citing *Doran v. Salem Inn, Inc.*, 422 U.S. 922, 931-32 (1975) ("[T]he standard of appellate review is simply whether the issuance of the injunction, in the light of the applicable standard, constituted an abuse of discretion")).  The Court only "review[s] such a decision *de novo* where it 'rests *solely* on a premise as to the applicable rule of law, and the facts are established or of no controlling relevance.'"  *Va. Carolina Tools*, 984 F.2d at 116 (emphasis added); *accord Signature Flight*

*Support Corp. v. Landow Aviation Ltd. P'ship*, 442 F. App'x 776, 784 (4th Cir. 2011) ("We review a grant or denial of a permanent injunction for abuse of discretion, reviewing factual findings for clear error and legal conclusions de novo").

The abuse of discretion standard applies even where injunctive relief is denied on summary judgment. *See*, *e.g.*, *Woollard v. Gallagher*, 712 F.3d 865, 873-74 (4th Cir. 2013) (quoting *Va. Carolina Tools*, 984 F.2d at 116); *see also Midgett v. Tri-Cnty. Metro. Transp. Dist. of Or.*, 254 F.3d 846, 849 (9th Cir. 2001) ("We review a 'summary judgment granting or denying a permanent injunction for abuse of discretion and application of the correct legal principles.' … Otherwise, we review de novo a grant of summary judgment") (citations omitted); *Schutt Mfg. Co. v. Riddell, Inc.*, 673 F.2d 202, 207 (7th Cir. 1982) (ruling that "the district court did not abuse its discretion in granting summary judgment denying the injunction").

Here, the District Court exercised its discretion to deny injunctive relief based on the undisputed facts described above. Thus, the court's decision is reviewed for abuse of discretion. A district court abuses its discretion "when it acts arbitrarily or irrationally, fails to consider

20

judicially recognized factors constraining its exercise of discretion, relies on erroneous factual or legal premises, or commits an error of law." *United States v. Delfino*, 510 F.3d 468, 470 (4th Cir. 2007), *cert. denied*, 555 U.S. 812 (2008).

## **ARGUMENT**

## I.    THE DISTRICT COURT CORRECTLY CONCLUDED THAT INJUNCTIVE RELIEF IS IMPRACTICABLE.

The District Court properly applied Maryland law in concluding that Lord & Taylor was not entitled to injunctive relief.

### A.    Courts Do Not Grant Injunctions Or Order Specific Performance Where Ongoing Court Supervision Would Be Required.

The District Court, sitting in diversity, was required to apply Maryland law to Lord & Taylor's request for a permanent injunction in Count II. *See Capital Tool & Mfg. Co., Inc. v. Maschinenfabrik Herkules*, 837 F.2d 171, 172 (4th Cir. 1988) (stating that federal law applies to preliminary injunctions and state law to permanent injunctions). Under Maryland law, an injunction is a "drastic remedy," *Ammendale Normal Inst., Inc. v. Schrom Constr., Inc.*, 288 A.2d 140, 143 (Md. 1972), and the grant or denial of an injunction is a matter of judicial discretion, not a question of right, *see Eastside Vend*

21

*Distributors, Inc. v. Pepsi Bottling Group, Inc.*, 913 A.2d 50, 63 (Md. 2006) (the decision whether to issue an injunction "is a matter resting in the sound discretion of the court"); *Kemp v. Kemp*, 411 A.2d 1028, 1035 (Md. 1980) (specific performance "is a remedy that rests within the discretion" of the court); *William F. Wilke, Inc. v. Dep't of Army*, 485 F.2d 180, 182 (4th Cir. 1973) ("Whether to grant such extraordinary relief [as an injunction] has always been discretionary with the trial court").

Except in cases of rare public importance, courts do not grant injunctions or order specific performance where such relief would require ongoing supervision and enforcement.  This general rule is well established.  *See*, *e.g.*, *Marble Co. v. Ripley*, 77 U.S. 339, 358-59 (1870) (finding specific performance impracticable where it would require continuous supervision of the parties' contract, including "not only whether the prescribed quantity of marble has been delivered, but whether every block was from the right place, whether it was *sound*, whether it was of *suitable size*, or *shape*, or *proportion*") (original emphasis); *United States v. Paramount Pictures, Inc.*, 334 U.S. 131, 161-

66 (1948) (vacating injunction that required continuous and detailed oversight of "business management"). It is a principle of equity that

> [c]ontracts which by their terms stipulate for a succession of acts, whose performance cannot be consummated by one transaction, but will be continuous, and require protracted supervision and direction, with the exercise of personal knowledge, skill, or judgment in such oversight, … are not, as a rule, specifically enforced.

John Norton Pomeroy, *A Treatise on the Specific Performance of Contracts*, § 312; *see also Edison Realty Co. v. Bauernschub*, 62 A.2d 354, 358 (Md. 1948) ("[S]pecific performance will not be decreed if the performance is of such a character as to make effective enforcement unreasonably difficult or to require such long-continued supervision by the court as is disproportionate to the advantages to be gained from such a decree and to the harm to be suffered in case it is denied"); *Storch*, 620 A.2d at 414 (same); Restatement (Second) of Contracts § 366 ("Effect of Difficulty in Enforcement or Supervision") (1981) (same).

Courts frequently apply this rule in the shopping center context, exercising their discretion to deny injunctions where the party enjoined would have to engage in varied acts requiring court oversight and management. *See*, *e.g.*, *Storch*, 620 A.2d at 414 (affirming the denial of an injunction to enforce a continuous operations clause in a retail

23

lease); *CBL & Assocs., Inc. v. McCrory Corp.*, 761 F. Supp. 807, 808-09 (M.D. Ga. 1991) (citing the "well-settled principle that equity will not order the specific performance of a contract where doing so would require the continuous supervision of the court"; denying a retail landlord an "injunction to keep the defendant [store] *in* business"; noting that "if there were ever a disagreement over [the tenant's] performance it would be this court … who would have to resolve it") (emphasis in original); *8600 Assocs., Ltd. v. Wearguard Corp.*, 737 F. Supp. 44, 45-46 (E.D. Mich. 1990) (noting that "decisions denying injunctive relief [where extensive court oversight would be involved] reflect the modern trend and the majority rule") (internal quotation marks and citations omitted).

The ruling by the Maryland Court of Special Appeals in *Storch* is instructive. *Storch* involved a retail tenant's violation of a continuous operations clause in its shopping center lease. The plaintiff there, like Lord & Taylor here, argued that all it wanted was a "negative injunction" – nothing more than "a simple order that says, [the tenant store, which had closed,] may not continue to breach the continuous operations clause." 620 A.2d at 412. The Maryland Court of Special

24

Appeals disagreed, noting the practical effect of such an injunction and the affirmative exercise of skill and judgment that compliance with it would require. *Id.*, at 414 ("An interlocutory injunction that requires Erol's to reopen its Hilltop store would be of the 'mandatory' variety – Erol's would have to interview, hire, train, and oversee management and employees. [The] testimony makes clear that the day-to-day operations of the store would necessarily include varied and continuous acts that require the exercise of special skill, taste, and judgment") (citations omitted). In affirming the trial court's refusal to grant an injunction, the Court of Special Appeals cautioned that, if an injunction were granted, the trial court would necessarily "become a referee" in the event of any subsequent dispute between the parties about compliance with the injunction. *Id.*, at 412.

### B. The District Court Properly Exercised Its Discretion To Deny Lord & Taylor's Request For An Injunction.

Here, the need for ongoing court supervision would have been far greater than in *Storch*. The parties agree that the REA requires White Flint to operate a first-class shopping center. JA 332-33. The mall is 75 percent vacant and has just one anchor tenant, and the space formerly occupied by the second anchor tenant is gone. The demolished space

was 249,970 square feet and occupied 33 percent of the total square footage (755,529) of the mall.  The mall cannot be left in this state.  Thus, beyond merely ordering a stop to the redevelopment, the District Court would have had to order White Flint to take specific affirmative steps – including, at a minimum, finding suitable tenants to fill the vacancies in a first-class mall, building out the vacant spaces for these new tenants, and rebuilding the demolished Bloomingdale's space.

An injunction of this sort would have entangled the District Court in overseeing the mall's re-tenanting, reconstruction, and operations.  The District Court necessarily would become bogged down in defining the meaning of a first-class shopping mall, including determining the proper tenant mix for the mall, evaluating whether White Flint's selection of tenants was achieving that mix, determining whether the reconstruction was consistent with the standards of a first-class shopping mall, and deciding whether White Flint was performing the upkeep and renovations necessary for the operation of such a first-class mall.  Lord & Taylor's current lease expires in 2042 and Lord & Taylor has an option to extend the term to 2057; therefore, the Court would have to arbitrate these issues for the next 28 to 43 years.  It is

impossible to frame and enforce a workable injunction order under these circumstances.

Lord & Taylor argued below that all the District Court had to do was issue an order requiring White Flint to comply with Section 6.1(b) of the REA. JA 762. While such an order might have surface appeal, it would not work in practice, particularly given the sanctions attending a violation of an injunction, even if unintentional. Section 6.1(b) of the REA states that White Flint may not change the design, appearance, or arrangement of the mall unless Lord & Taylor's consents. JA 75-77. Simply recasting that provision in the form of an injunction would put White Flint in constant risk of violating the order. As a result, White Flint would be unable to upgrade or modernize the mall in any material respect; it would be unable to negotiate with prospective tenants concerning the structure and layout of their premises; and it would be unable to alter pedestrian or traffic flow as necessary to accommodate the needs of prospective tenants. JA 18 (request by Lord & Taylor in Count II to bar White Flint from "mak[ing] any changes which would unreasonably restrict pedestrian and vehicular traffic to the Shopping Center Site and Lord & Taylor's Store"). Every decision by White Flint

27

regarding the mall would be fraught with risk of contravening the terms of the court's order. And, as in *Storch*, the District Court would then have to be the "referee" in every dispute between the parties about compliance with the injunction.

Lord & Taylor argued below (and continues to argue here) that no oversight by the court would have been required because it sought in Count II only a "negative" injunction to stop the redevelopment. This assertion is demonstrably false. In addition to asking for an injunction stopping the redevelopment, *see* Appellant's Brief, at 46 and 49, Lord & Taylor specifically sought in Count II an order requiring White Flint to operate a first-class mall at the mall site. JA 18 ("Lord & Taylor further asks this Court, in conjunction with maintaining the status quo, to require Landlord to abide by its obligations under the [REA] to operate a first class high fashion regional retail Shopping Center at the" mall site); *see also* JA 19 ("[B]y issuing the injunction, the Court will be maintaining the status quo and ensuring that [White Flint] will continue to honor its contractual obligations to operate a first class retail Shopping Center, *with a vibrant and tenant occupied Enclosed Mall*, while the Agreement is in effect") (emphasis added).

Moreover, an order merely stopping the redevelopment in its tracks, and leaving the mall as it was, was not an option, given the mall's condition. Even leaving aside the REA, which requires White Flint to operate a first-class mall at the site, the mall cannot be left dark and partially torn down, as the District Court recognized.

In short, the District Court properly held that it was not feasible to order White Flint to maintain the mall in its current state and that courts have neither the resources nor the expertise to make the kinds of decisions an affirmative injunction in this case would have required. As such, it properly exercised its discretion not to grant an injunction.

## II. THE DISTRICT COURT APPLIED THE PROPER LEGAL STANDARD.

Lord & Taylor contends the District Court erred by applying federal law instead of state law to Lord & Taylor's claim for a permanent injunction, thereby erroneously requiring Lord & Taylor to show irreparable harm. Lord & Taylor also argues that the District Court erred by improperly considering various factors, including the public interest, the hardship to White Flint from an injunction, and changes to the area around the mall. Lord & Taylor mischaracterizes the District Court's decision.

## A.    The District Court's Decision Is Consistent With *Redner's.*

Lord & Taylor contends that the court ignored or misapplied *Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship.* However, the District Court's conclusion that an injunction is unavailable as a remedy in these circumstances is consistent with *Redner's* and other Maryland case law.

*Redner's* is an unreported opinion. In that case, the district court determined that Maryland law applies to requests for permanent injunctions in diversity cases and that, under Maryland law, a party seeking a permanent injunction to enforce a restrictive covenant does not need to show irreparable harm. 2013 WL 2903285, at *5.[3] The court stated that "[w]here a court finds that a restrictive covenant has been breached, a permanent injunction may be granted 'on the basis of the strength of the circumstances and equities of each party.'" *Id.*

---

[3] The court's conclusion that state substantive law governs the issuance of permanent injunctions in diversity cases is on appeal to the Fourth Circuit. *See generally* docket for *Redner's Markets, Inc. v. Joppatowne G.P. Ltd. P'ship*, consolidated case Nos. 13-1766, 13-1974, 13-2279. Under the federal standard, a party seeking a permanent injunction must show irreparable harm. *See eBay Inc. v. MercExchange, LLC*, 547 U.S. 388, 391 (2006).

(quoting *Chestnut Real Estate P'ship v. Huber*, 811 A.2d 389, 398 (Md. Ct. Spec. App. 2002)).

As a preliminary matter, *Redner's* is based on an incorrect legal foundation. The court's rationale for holding that a showing of irreparable harm is not required was that "a permanent injunction to enforce a restrictive covenant is much like a request for specific performance[.]" *Id.* (quoting *Chestnut*). *Redner's* cites *Chestnut*, which in turn cites *Md.-Nat'l Capital Park & Planning Comm'n v. Wash. Nat'l Arena*, 386 A.2d 1216, 1229 (Md. 1978), *see* 811 A.2d at 399, for this proposition.

Under Maryland law, however, specific performance will not be ordered where there is an adequate remedy at law:

> Specific performance is an extraordinary equitable remedy which may be granted, in the discretion of the chancellor, where more traditional remedies, such as damages, are either unavailable or inadequate.

*Yaffe v. Scarlett Place Residential Condo., Inc.*, 45 A.3d 844, 858 (Md. Ct. Spec. App. 2012) (quotation marks and citation omitted) (affirming the denial of specific performance on the ground that "the Plaintiff has not demonstrated that there is no adequate remedy at law"); *see also* Md. Code, Cts. & Jud. Proc. § 3-601 (recognizing a court's ability to

31

refuse specific performance on the ground that the party seeking it has "an adequate remedy in damages"). Thus, there is a logical inconsistency in *Redner's*, *Chestnut*, and *Md.-Nat'l*.

Moreover, the two cases cited by *Md.-Nat'l* for the proposition that specific performance does not require a showing of irreparable harm – the legal predicate for the line of cases on which Lord & Taylor relies – do not address that precise issue. The cases merely restate the unremarkable rule that a court's decision whether to grant specific performance is discretionary. *See generally Hupp v. George R. Rembold Bldg. Co.*, 369 A.2d 1048 (Md. 1977); *Gross v. J & L Camping & Sports Ctr., Inc.*, 312 A.2d 270 (Md. 1973). But, as *Yaffe* makes clear, a court's discretion to grant specific performance arises only "where more traditional remedies, such as damages, are either unavailable or inadequate." 45 A.3d at 858.

In any case, the District Court's denial of Lord & Taylor's request for an injunction is consistent with the court's holding in *Redner's*. It does not undermine property rights or create a split in this circuit as to the applicable legal standard, as Lord & Taylor contends. *Redner's* does not mandate the issuance of a permanent injunction whenever a

32

restrictive covenant allegedly has been breached. To the contrary, *Redner's* acknowledges the inherent discretion of courts to deny injunctive relief when granting such relief would be impracticable, even where a party will likely suffer irreparable harm.

The *Redner's* court recognized that, even where a breach has been found, the court may deny enforcement of a restrictive covenant "*where the factors that argue against implementing the particular provision* clearly and unequivocally outweigh the law's traditional interest in protecting the expectations of the parties, its abhorrence of any unjust enrichment, and any public interest in the enforcement of the contested term." 2013 WL 2903285, at *6 (quoting *Md.-Nat'l*, 386 A.2d at 1229) (emphasis added); *see also id.*, at *5 ("Where a court finds that a restrictive covenant has been breached, a permanent injunction *may* be granted 'on the basis of the strength of the circumstances and equities of each party'") (quoting *Chestnut*, 811 A.2d at 398) (emphasis added); *Coffman v. James*, 177 So. 2d 25, 31 (Fla. Dist. Ct. App. 1965), cited by Lord & Taylor, *see* Appellant's Brief, at 24 (recognizing that a party's right to an injunction "to restrain the violation of a restrictive covenant affecting real estate" is subject to "sound judicial discretion").

*Redner's* is consistent with *Storch*, and the two cases should be read together.  They both support the settled rule that injunctive relief is discretionary and, therefore, courts have the authority to deny it when granting such relief would involve the court in protracted supervision and direction.  Injunctions were granted in *Redner's* and the other cases cited by Lord & Taylor in its brief because, unlike *Storch* and here, none of them involved affirmative injunctions requiring extended judicial oversight:

- *Redner's* involved an injunction to bar two farmer's market vendors from operating in violation of a noncompetition agreement in a lease;

- *Chestnut* involved the defendant's right to construct a metal garden shed and additional parking spaces on his property;

- *Eisenstadt v. Barron*, 250 A.2d 85 (Md. 1969), involved the defendant's right to use his property for non-residential purposes and the removal of a water line he had installed in violation of a restrictive covenant;

- *Colandrea v. Wilde Lake Cmty. Assoc., Inc.*, 761 A.2d 899 (Md. 2000), involved the right of an owner in a planned residential community to operate a small business out of his house without the approval of the community association.

- *City of Bowie v. MIE Props., Inc.*, 922 A.2d 509 (Md. 2007), involved the defendant's right to use office space as a dance studio;

34

- *Dumbarton Imp. Ass'n, Inc. v. Druid Ridge Cemetery Co.*, 73 A.3d 224 (Md. 2013), involved a proposed residential development on land restricted to cemetery use;

- *Grubb v. Guilford*, 178 A.2d 886 (Md. 1962), involved the defendant's right to operate a doctor's office out of the basement of his house;

- *Kirkley v. Seipelt*, 128 A.2d 430 (Md. 1957), involved a homeowner's right to install awnings on his home in violation of a restrictive covenant;

- *Mikolasko v. Schovee*, 720 A.2d 1214 (Md. Ct. Spec. App. 1998), involved a homeowner's right to construct multiple dwellings on a single residential lot; and

- *Souza v. Columbia Park & Recreation Ass'n, Inc.*, 522 A.2d 1376 (Md. Ct. Spec. App. 1987), involved the defendants' right under a restrictive covenant to subdivide their residential lot.

None of these cases required the trial court to exercise the extensive level of supervision that would be required here. None of them stand for the proposition that a court does not have the discretion to deny an injunction when granting such relief would impose heavy burdens of supervision and enforcement on the court. Lord & Taylor has not cited a single case where a court undertook the oversight of a reconstruction and re-tenanting process like the one that would be required here.

The District Court's ruling does not "decimat[e]" property rights or stand *Redner's* on its head, as Lord & Taylor argues. *See* Appellant's Brief, at 2 and 29. Nothing in the District Court's ruling would preclude a court from exercising its discretion to grant an injunction where such relief is necessary *and* practicable. And, notwithstanding Lord & Taylor's claim, the District Court's decision does not "eliminate a party's right in Maryland" to enjoin the breach of a restrictive covenant, *see* Appellant's Brief, at 3, if a court determines that an injunction is feasible in a particular situation.

### B.    The District Court's Decision Was Based On The Impracticability of Injunctive Relief In This Case.

The District Court twice stated that it was denying Lord & Taylor's request for injunctive relief because such relief was impracticable. It made this rationale clear at the December 20, 2013, hearing, JA 799-801, and in its order denying Lord & Taylor's request for a stay, JA 814. This finding of infeasibility was the sole reason the District Court granted summary judgment on Count II.

The District Court's ruling was not predicated on the doctrine of comparative hardship, s*ee* Appellant's Brief, at 37-38; a finding that the redevelopment is in the public interest, *id.*, at 24-25; or a finding of

36

"changed circumstances" in the area around the mall site, *id.*, at 39-46. These factors are all valid considerations in a court's exercise of its discretion to grant or deny injunctive relief, *see Redner's*, 2013 WL 2903285, at *5, and they would support denial of an injunction here. But the District Court declined to grant Lord & Taylor's request for injunction solely because of the impracticability of such relief in light of the current condition of the mall.

It is disingenuous for Lord & Taylor to argue to this Court that the District Court relied upon the doctrine of "changed circumstances" in its order. That doctrine provides that a restrictive covenant will not be enforced if, "after the passage of a reasonable period of time, the continuing validity of the covenant cannot further the purpose for which it was formed in light of changed relevant circumstances." *Dumbarton*, 73 A.3d at 238 (internal quotation marks and citation omitted). White Flint asserted the doctrine of changed circumstances as a defense to Count I. But, in its decision granting summary judgment on Count II, the District Court made no finding of changed circumstances in the area around the mall, let alone a determination as to the continuing validity

37

of the restrictive covenants in the REA in light of any such changes.[4]

Rather, the District Court noted the undisputed changes that have occurred *at the mall* that make injunctive relief impracticable. The Court stated:

> There has been an enormous change at White Flint. … [T]here has been an enormous change that's gone on at White Flint in terms of physical changes, tenant changes, and the ability of this Court to grant [injunctive] relief would be very problematic.

JA 799-800. Lord & Taylor's mischaracterization of the District Court's opinion is akin to its failure to inform this Court of its request for, and then abandonment of, preliminary injunctive relief below.

The District Court's denial of a permanent injunction also was not predicated on a finding that Lord & Taylor has an adequate remedy at law. The District Court stated that Lord & Taylor could be compensated by money damages if the court were to conclude that White Flint breached the REA. But the court's denial of injunctive relief was not contingent on that finding. Rather, the court was noting that, even though Lord & Taylor had not included a claim for monetary

---

[4] If it had, the District Court would have found the covenants unenforceable under *Dumbarton* and dismissed Count I, thus ending the litigation.

relief in Count I, the court had the authority to grant such relief under

28 U.S.C. §§ 2201 and 2202.  The District Court stated:

> I do want to point out that although Count One does not have in it a request for damages, that federal law on declaratory judgments, like Maryland law on declaratory judgments, permits, and I am quoting from 28 U.S.C. Section 2201 and 2202, which, after providing for the creation of a declaratory remedy says, Further necessary or proper relief based on a declaratory judgment or decree may be granted after reasonable notice and hearing against any adverse party whose rights have been determined by such judgment.
>
> So, if, arguendo, I were to conclude in future proceedings that White Flint breached its agreements with Lord & Taylor under Count One … the Court would certainly have the authority, under the further relief provision, to come back and revisit it, including the question of damages.
>
> So, while it would have been nicer to have the complaint ask for damages, that nicety is not necessarily fatal to a request for damages at a later time if I were to declare a violation.

JA 798-99.

In short, the impracticability of an injunction, in light of the

undisputed facts, was an independent reason for the District Court's

refusal of an injunction.  That is the only fair reading of the District

Court's opinion.  JA 797-801 and JA 808-09.

39

## III.   LORD & TAYLOR HAS AN ADEQUATE REMEDY AT LAW.

For the reasons just discussed, the District Court's denial of Lord & Taylor's request for an injunction was not predicated on a finding that Lord & Taylor has an adequate remedy at law.  That question therefore has no bearing on the issue before the Court in this appeal. The District Court was correct, however, that Lord & Taylor will not be irreparably harmed by the redevelopment.  The law is clear that lost profits are readily ascertainable in cases like this one.

### A.   Lord & Taylor Will Benefit From The Redevelopment.

In fact, Lord & Taylor never contested in its opposition to White Flint's motion for summary judgment that, if the redevelopment were to proceed, its damages, if any, could be readily ascertained and quantified given its long sales history at the mall.  *See* ECF No. 44.  Moreover, Lord & Taylor's decision not to move for a temporary restraining order or preliminary injunction speaks volumes, and it raises the question: How worried can Lord & Taylor really be about the impact of the redevelopment on its store?  The only logical answer is, not very. Indeed, Lord & Taylor has acknowledged that it stands to *benefit* from the redevelopment.  *See supra*, at 10.  It has never disputed that its sales have dropped steadily over the past 15 years.  To the contrary, it

40

has stated that it projects its annual gross sales to increase from $23.5 million to over $40 million once the redevelopment is completed.

### B. Any Injury To Lord & Taylor Is Compensable With Money.

Irreparable injury occurs only where the moving party cannot be adequately and readily compensated by money. *See, e.g.*, *Bethesda Softworks, LLC v. Interplay Entm't Corp.*, 452 Fed. Appx. 351, 353-54 (4th Cir. 2011) (harm is not irreparable where it "can be remedied by money damages"); *Person v. Mayor of Baltimore*, 437 F. Supp. 2d 476, 479 (D. Md. 2006) ("[H]arm is not 'irreparable' if it can be compensated by money damages during the normal course of litigation").

Any harm to Lord & Taylor from a change to the layout and structure of the mall would be compensable by money. The mall's physical characteristics and specific layout – including store visibility, tenant mix, parking, pedestrian walkways, street networks, pathways for customer ingress and egress and the like – affect the volume and flow of customers to, and, therefore, the sales at, the mall's stores. To the extent that the layout of the mall is changed and Lord & Taylor's sales suffer as a result, Lord & Taylor can be adequately compensated by money damages. *See*, *e.g.*, *Mike's Train House, Inc. v. Broadway Ltd.*

41

*Imports, LLC*, 708 F. Supp. 2d 527, 532 (D. Md. 2010) (stating that "potential lost sales revenue is compensable through damages"; "evidence of such losses is insufficient by itself to support a finding of irreparable harm").

Lost profits are readily calculable where, as here, historical sales data are available. *See*, *e.g.*, *Strauss v. Peninsula Reg'l Med. Ctr.*, No. 95-2424, 1996 WL 265928, at *1 (4th Cir. May 20, 1996) ("The history of plaintiff's patient volume would certainly enable a jury to compensate any business loss suffered by plaintiffs with a monetary judgment"); *Dayton Heidelberg Distrib. Co. v. Vineyard Brands, Inc.*, 108 F. Supp. 2d 859, 865 (S.D. Ohio 2000) (holding it "quite simple to calculate" damages based on "historical records … for Plaintiffs' sales and expenses"; finding no irreparable harm to support preliminary injunction); *3M Co. v. Avery Dennison Corp.*, No. 10-2630, 2010 WL 5288168, at *11 (D. Minn. Dec. 21, 2010) (denying injunction where damages were "easily quantifiable" because of a "record of pricing and sales to assist in computing money damages"); *Gebhardt European Autos, LLC v. Porsche Cars of N. Am., Inc.*, No. 10-cv-02696-MSK-KMT, 2010 WL 6575913, at *9 (D. Colo. Dec. 20, 2010) (finding no irreparable

harm where "damages would be readily ascertainable" because of "detailed records of … profits and losses from sales and service," from which lost future revenue could be computed).

*Optivision, Inc. v. Syracuse Shopping Ctr. Assocs.*, 472 F. Supp. 665 (N.D.N.Y. 1979), is instructive.  In that case, a retail store that leased space in a shopping center sought a preliminary injunction to enforce a noncompetition clause in its lease with the shopping center's owner.  The court denied the retailer's request because lost sales are compensable by money damages and, therefore, the retailer had an adequate remedy at law.  The court wrote:

> [E]ven if a likelihood of success were shown on one or more claims, Optivision's motion for a preliminary injunction would have to be denied because of its failure to demonstrate irreparable harm.  Optivision's principal claim of harm is that it will lose a valuable business asset[,] the location of its Northern Lights store and the good will of the customers who patronize that retail outlet.  However, this claim is essentially one for lost profits.  It appears that, if plaintiff prevails at trial, it will be possible to compute, with a reasonable degree of certainty, the damages it will suffer. … The ability to compute monetary damages establishes that the harm which plaintiff would suffer is not irreparable in nature.

472 F. Supp. at 685.

43

Lord & Taylor has operated in the mall since 1977.  JA 369.  It has over 35 years of historical sales data for its store and is required under its sublease to report its sales revenue to White Flint every year.  JA 214.  This operating history provides a detailed roadmap of the store's profitability and is sufficient to document any lost profits that Lord & Taylor allegedly may incur as a result of the redevelopment.

### C. Lord & Taylor's Damages, If Any, Are Readily Calculable.

Lord & Taylor asserts that its damages are too speculative and uncertain to be calculated because the final site plan has not been approved.  In Maryland, however, a plaintiff is entitled to lost profits where it can establish damages with "reasonable certainty."  *See, e.g.*, *Impala Platinum Ltd. v. Impala Sales (U.S.A.), Inc.*, 389 A.2d 887, 907 (Md. 1978).  This standard replaced the traditional, strict requirement that parties establish damages with complete "certainty."  *Id.* "Reasonable certainty" may be established by expert opinion and the reasonable inferences that may be drawn from it:

> [R]ecovery may often be based on opinion evidence, in the legal sense of that term, from which liberal inferences may be drawn.

***

44

> [I]f the fact of damage is proven with certainty, the extent or the amount thereof may be left to reasonable inference[.] … [M]ere difficulty in ascertaining the amount of damage is not fatal; … mathematical precision in fixing the exact amount is not required; … it is sufficient if the best evidence of the damage which is available is produced ….

*Id.* (quotation marks and citations omitted). Under Maryland law, even new businesses with no track record of any kind may recover anticipated profits based on expert testimony concerning market conditions and comparable enterprises. *See, e.g.*, *Sergeant Co. v. Clifton Bldg. Corp.*, 423 A.2d 257, 263 (Md. Ct. Spec. App. 1980).

Here, the general plan for the redevelopment of the mall site and the surrounding areas is set forth in the sketch plan and the White Flint Sector Plan. JA 396-436. Final site plan approval is expected within the next year. Thus, by the time Lord & Taylor's claims in Count I are tried,[5] the details of the redevelopment will be even clearer than they are now. That information will only enhance Lord & Taylor's opportunity to prove its alleged damages through expert testimony concerning projected sales in light of the redevelopment. *See CR-RSC*

---

[5] The parties have not yet scheduled depositions or designated experts with respect to Count I.

*Tower I, LLC v. RSC Tower I, LLC*, 32 A.3d 456, 476-78 (Md. Ct. Spec. App. 2012) (discussing *Macke Co. v. Pizza of Gaithersburg, Inc.*, 270 A.2d 645 (Md. 1970), and *Fowler v. Printers II, Inc.*, 598 A.2d 794 (Md. Ct. Spec. App. 1991)). Lord & Taylor routinely projects sales, revenues, and profits for the stores it is contemplating opening (or closing) throughout the United States. Its business model depends on the accuracy of such forecasts. Lord & Taylor's claim that it cannot reasonably measure the impact of White Flint's redevelopment plan on traffic flows and other traditional industry indicia is not credible.

Thus, any future damages to Lord & Taylor's store will be quantifiable. *See, e.g., CR-RSC*, 32 A.3d at 478-79 (lost profits reasonably certain even though based on a pro forma projecting profits for a new building that was not yet fully leased); *Trimed, Inc. v. Sherwood Med. Co.*, 772 F. Supp. 879, 887-89 (D. Md. 1991) (damages not too speculative where expert calculated profit streams 11 years into the future and accounted for numerous variables, including different contract termination scenarios and lawful competition). Moreover, Lord & Taylor alleges in its Complaint that it has already been harmed by White Flint's conduct in allegedly forcing out mall tenants and moving

46

forward with the redevelopment plan.  JA 14, 15, 17.  To the extent Lord & Taylor has been damaged to date, those damages are neither speculative nor uncertain.

### D. There Is No Threat To Lord & Taylor's Existence As A Business.

Given that any economic harm caused by the redevelopment would be reasonably quantifiable and, therefore, fairly compensable by money damages, Lord & Taylor's alleged harm from altering the layout of the mall is not irreparable.  Indeed, economic loss is considered irreparable only when it threatens the very existence of a company's business.  *See Optivision*, 472 F. Supp. at 686.  If a company has multiple locations, the existence of the company as a whole, not just the specific location in question, must be in jeopardy for an injunction to issue.  *Id.*, at 686 ("In addition to its Northern Lights store, Optivision has a number of other retail outlets in New York State and Georgia. The continued operation of Optivision as a corporate entity does not appear to be threatened"); *Amtote Int'l, Inc. v. PNGI Charles Town Gaming Ltd. Liab. Co.*, 998 F. Supp. 674, 678 (N.D.W. Va. 1998) (noting that "extraordinary circumstances have been found to exist if the denial

of injunctive relief would likely cause the business to collapse," but that "[t]his is not the situation before this Court").

Lord & Taylor's store is just one of approximately 50 stores operated by Lord & Taylor in various states across the country. JA 466-67. Lord & Taylor also operates "two Lord & Taylor Home stores, several outlet stores, and [an] online shopping site." *Id.* Thus, Lord & Taylor cannot allege – and, in fact, has never alleged – that it is in danger of being put out of business because of the planned redevelopment.

### E. Any Harm To Lord & Taylor's Goodwill Does Not Provide A Basis For Injunctive Relief.

To the extent Lord & Taylor is arguing that its goodwill or reputation will suffer as a result of the redevelopment, neither of these alleged harms provides a basis for injunctive relief. First, it is well-established that a company's goodwill can be quantified and, therefore, that the loss of goodwill is not a legitimate basis for an injunction:

> Plaintiff also argues that they will suffer irreparable harm due to the loss of goodwill, which cannot be calculated monetarily. However, this Court takes judicial notice under Fed R. Evid. 201 that the Financial Accounting Standards Board ("FASB"), an SEC-approved organization designated to establish standards for financial accounting in the private sector, has a voluminous standard for dealing with goodwill

48

> in order to calculate its value on a balance sheet. This ability to calculate money damages from the impairment of goodwill demonstrates an adequate remedy at law.

*Torres Advanced Enter. Solutions, LLC v. Mid-Atl. Prof'ls Inc.*, No. PWG-12-3679, 2013 WL 531215, at *5 (D. Md. Feb. 8, 2013) (denying plaintiff's request for a temporary restraining order).

Second, to justify injunctive relief, the harm alleged must be certain and imminent. *See, e.g., Scotts Co. v. United Indus. Corp.*, 315 F.3d 264, 283 (4th Cir. 2002) (plaintiff must make a "strong showing" of irreparable harm that is "neither remote nor speculative, but actual and imminent"); *Person*, 437 F. Supp. 2d at 479 ("The harm demonstrated by the plaintiff must be neither remote nor speculative, but actual and imminent"). Lord & Taylor has never produced any evidence that it will suffer specific, imminent harm to its goodwill or reputation absent an injunction.

## **CONCLUSION**

For the reasons discussed above, the judgment of the District Court should be affirmed. The District Court properly concluded that injunctive relief was impracticable given the current state of the White Flint Mall, which Lord & Taylor has never disputed.

Respectfully submitted,

KATTEN MUCHIN ROSENMAN LLP

By:  /s/ S. Scott Morrison
     S. Scott Morrison (Bar No. 06540)
     2900 K Street, N.W.
     North Tower – Suite 200
     Washington, D.C.  20007
     (202) 625-3500 / (202) 298-7570 (fax)
     scott.morrison@kattenlaw.com

     *Counsel for Appellee*

50

## <u>STATEMENT REGARDING ORAL ARGUMENT</u>

White Flint respectfully requests that the Court hear oral argument.

/s/ S. Scott Morrison
S. Scott Morrison

*Counsel for Appellee*

## <u>CERTIFICATE OF COMPLIANCE</u>

This brief complies with the type-volume limitation of Fed. R. App. 32(a)(7)(B) because it contains 10,200 words, excluding the parts of the brief exempted by Fed. R. App. P. 32(a)(7)(B)(iii).  This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Word in Century Schoolbook 14.

/s/ S. Scott Morrison
S. Scott Morrison

*Counsel for Appellee*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that a true and correct copy of the foregoing Brief of Appellee was filed electronically on March 13, 2014, and will therefore be served electronically upon all counsel by the Court's CM/ECF system.

/s/ S. Scott Morrison
S. Scott Morrison

*Counsel for Appellee*